In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 14-1223

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PARRISH KAPPES,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:12-cr-20080-MPM-DGB-1 — **Michael P. McCuskey**, *Judge.*

---

No. 14-2135

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID L. CRISP, JR.,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 2:13-cr-20050-MPM-DGB-1 — **Michael P. McCuskey**, *Judge.*

―――――――――――

No. 14-2482

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JEFFREY J. JURGENS,

*Defendant-Appellant*.

―――――――――――

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:13-cr-40048-SLD-JEH-1 — **Sara Darrow**, *Judge*.

―――――――――――

ARGUED NOVEMBER 14, 2014 — DECIDED APRIL 8, 2015

―――――――――――

Before BAUER, FLAUM, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. We resolve three appeals in a single
opinion because the appeals raise similar challenges to con-
ditions of supervised release. Although supervised release
has been a feature of the federal criminal justice system for
nearly thirty years, with over a million federal defendants
having been sentenced to supervised-release terms, during
the past several years we have addressed certain aspects of
supervised release for the first time.[1] Some defendants,

―――――――――――

[1] *See, e.g.*, *United States v. Sewell*, --- F.3d ----, No. 14-1384, 2015 WL
1087750 (7th Cir. Mar. 13, 2015); *United States v. Thompson*, 777 F.3d 368

judges, lawyers, and probation officers might characterize our recent focus on these issues as better late than never, while others might grumble that we are trying to fix an unbroken system. In any event, we hope our recent jurisprudence results in the imposition of supervised-release conditions that are properly-noticed, supported by adequate findings, and well-tailored to serve the purposes of deterrence, rehabilitation, and protection of the public.

The first section of this opinion provides an overview of the system of supervised release, including four general sentencing principles judges should consider. Next, we outline the history, crimes, and sentencings of the three defendants at issue. Then, we address the specific supervised-release challenges raised by each defendant, organized by the four general sentencing principles. Lastly, we consider Defendant Crisp's contention that the sentencing judge failed to consider one of his principal mitigation arguments.

---

(7th Cir. 2015); *United States v. Cary*, 775 F.3d 919 (7th Cir. 2015); *United States v. Hinds*, 770 F.3d 658 (7th Cir. 2014); *United States v. Johnson*, 765 F.3d 702 (7th Cir. 2014); *United States v. Farmer*, 755 F.3d 849 (7th Cir. 2014); *United States v. Baker*, 755 F.3d 515 (7th Cir. 2014); *United States v. Bryant*, 754 F.3d 443 (7th Cir. 2014); *United States v. Siegel*, 753 F.3d 705 (7th Cir. 2014); *United States v. Poulin*, 745 F.3d 796 (7th Cir. 2014); *United States v. Shannon*, 743 F.3d 496 (7th Cir. 2014); *United States v. Adkins*, 743 F.3d 176 (7th Cir.), *cert. denied*, 134 S. Ct. 2864 (2014); *United States v. Williams*, 739 F.3d 1064 (7th Cir. 2014); *United States v. Evans*, 727 F.3d 730 (7th Cir. 2013); *United States v. Goodwin*, 717 F.3d 511 (7th Cir.), *cert. denied*, 134 S. Ct. 334 (2013); *United States v. Quinn*, 698 F.3d 651 (7th Cir. 2012).

## I. Supervised Release

In 1984, Congress passed the Sentencing Reform Act, which replaced the federal parole system with the system of supervised release. *See* 18 U.S.C. § 3583; *see generally* S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182. The parole system allowed a convicted defendant to be released prior to the expiration of his prison term on conditions designed to reduce the likelihood of his committing further crimes. Parole was criticized for creating uncertainty as to how long a particular defendant would actually spend in prison—i.e., the judicially-imposed sentence was not considered the "real sentence" because it was "subject to constant adjustment by the parole commission"—which was viewed as undermining public respect for the law and defendants' morale. S. Rep. No. 98-225, at 56.

Under the replacement system of supervised release, judges impose conditions at sentencing which take effect after the completion of the defendant's prison term, and, in contrast to parole, do not reduce the length of the custodial portion of a defendant's sentence.[2] The purposes of supervised release have been variously described as rehabilitation, deterrence, training and treatment, protection of the public,

---

[2] However, as discussed below, it is probable (and proper) that sentencing judges impose both custody and supervised release for somewhat overlapping purposes, and if supervised release was not an option the same judge might impose a lengthier custodial sentence. In this way, the imposition of supervised release can be seen as potentially reducing the custodial sentence.

and reduction of recidivism. *See United States v. Johnson*, 529 U.S. 53, 59–60 (2000); *United States v. Siegel*, 753 F.3d 705, 708 (7th Cir. 2014); *United States v. Evans*, 727 F.3d 730, 733 (7th Cir. 2013). Supervised release was not intended to be imposed for the purposes of punishment or incapacitation, "since those purposes will have been served to the extent necessary by the term of imprisonment." S. Rep. No. 98-225, at 125; *see also Johnson*, 529 U.S. at 59 ("Supervised release fulfills rehabilitative ends, distinct from those served by incarceration."); *cf.* 18 U.S.C. § 3583(c) (directing a court contemplating the imposition of supervised release to consider most sentencing factors set forth in 18 U.S.C. § 3553(a), *except* the need for the sentence to provide just punishment for the offense). The Supreme Court has described supervised release as "the decompression stage" between prison and full release. *Johnson v. United States*, 529 U.S. 694, 709 (2000). "Prisoners may, of course, vary in the degree of help needed for successful reintegration. Supervised release departed from the parole system it replaced by giving district courts the freedom to provide postrelease supervision for those, and only those, who needed it. Congress aimed, then, to use the district courts' discretionary judgment to allocate supervision to those releasees who needed it most." *Id*. (citation omitted).

In some felony cases, including certain cases involving drug-trafficking, sex offenses and domestic violence, supervised release is mandated by statute. *See, e.g.*, 18 U.S.C. § 3583(a), (k); 21 U.S.C. §§ 841(b), 960(b). Between 2005 and 2009, approximately 41 percent of sentenced federal defendants were subject to statutes mandating supervised release. *See* U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release at 69 n.275 (2010), *available at*

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2010/20100722_Supervised_Release.pdf (last visited Mar. 26, 2015, as were all websites in this opinion). Although the sentencing guidelines call for supervised release in all remaining cases with a prison sentence of more than one year (with limited exceptions), *see* U.S.S.G. § 5D1.1(a)(2), the Supreme Court made the relevant provisions of the guidelines discretionary in 2005. *See United States v. Booker*, 543 U.S. 220, 245 (2005); *United States v. Parker*, 508 F.3d 434, 442 (7th Cir. 2007). The change from supervised release being mandatory to discretionary has made little practical difference: between 2005 and 2009, district courts imposed a term of supervised release in 99.1 percent of cases with a prison sentence in excess of one year but not subject to statutorily-mandated supervised release. U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release at 7, 52 n.241. So while supervised release may have been intended "for those, and only those, who needed it," *Johnson*, 529 U.S. at 709, the reality is that virtually all federal defendants who spend at least a year in custody are subject to supervised release.

The sentencing procedure generally is as follows. First the probation officer conducts a presentence investigation which culminates in the preparation of a presentence report. *See* 18 U.S.C. § 3552(a), (b); Fed. R. Crim. P. 32(c), (d). The presentence report identifies the kinds of sentences available, including the terms of supervised release which may be appropriate. *See* Fed. R. Crim. P. 32(d)(1)(C). The presentence report is disclosed to the parties at least 35 days before sentencing, and the parties state in writing any objections 14 days later. *See* Fed. R. Crim. P. 32(e)(2), (f)(1). At least seven days before sentencing, the presentence report, including

any addenda addressing objections, is submitted to the court and the parties. *See* Fed. R. Crim. P. 32(g).

At the sentencing hearing, the sentencing judge hears from the lawyers, the defendant and any victims who are present, and may receive evidence related to objections. *See* Fed. R. Crim. P. 32(i). Ultimately, the judge engages in a two-part analysis. First, the judge determines the defendant's sentencing range under the guidelines. *United States v. Adkins*, 743 F.3d 176, 189 (7th Cir.), *cert. denied*, 134 S. Ct. 2864 (2014). Second, the judge makes "an individualized assessment of the appropriate sentence based on the § 3553(a) factors." *Id.* (quotation omitted). Any term of supervised release is considered part of the overall sentence. *Id*. at 192. In determining whether to include a term of supervised release, and, if so, in determining the length of the term and the conditions of supervised release, the judge is required to consider the factors set out in 18 U.S.C. §§ 3553(a) and 3583(c)–(d), which are discussed below.

The sentencing judge's difficult task is not undertaken on a completely blank slate, but rather is structured by statutes and the guidelines, which recommend a range of terms of supervised release depending upon the category of offense, *see* 18 U.S.C. § 3583(b), and list certain mandatory and discretionary conditions, *see id.* §§ 3563(a)–(b), 3583(d); U.S.S.G. § 5D1.3. Some of the discretionary conditions are called "standard," U.S.S.G. § 5D1.3(c), while others are called "special," *id*. § 5D1.3(d)–(e), and are recommended for particular offenses. Sentencing judges also are empowered to "impose conditions of their own devising." *Siegel*, 753 F.3d at 707.

After the sentencing judge exercises his or her "wide discretion in determining conditions of supervised release" at

sentencing, *Adkins*, 743 F.3d at 193 (quotation omitted), the judge typically has no further occasion to consider the defendant's supervised release until after the defendant has completed the custodial portion of his sentence, begun serving supervised release under supervision by a federal probation officer, and the district court is presented with a motion for modification, revocation, or termination of supervised release. *See* 18 U.S.C. § 3583(e). Although not currently mandated by statute or the guidelines, we have suggested that sentencing judges "[r]equire that on the eve of his release from prison, the defendant attend a brief hearing before the sentencing judge (or his successor) in order to be reminded of the conditions of supervised release." *Siegel*, 753 F.3d at 717. This "would also be a proper occasion for the judge to consider whether to modify one or more of the conditions in light of any changed circumstances brought about by the defendant's experiences in prison." *Id*. Adopting this suggestion would help mitigate the inherent difficulty in imposing conditions at sentencing which do not go into effect until the defendant is released from custody—often many years in the future. *See id*. at 708. A defendant may change substantially during a long prison sentence, and the world outside the prison walls may change even more. A judgeship does not come equipped with a crystal ball.

The sentencing judge may terminate supervised release at any time after one year of supervision, if the judge determines such action is warranted by the defendant's conduct and serves the interests of justice. 18 U.S.C. § 3583(e)(1). For example, of the 42,984 active supervised release cases that closed during the 12-month period ending September 30, 2014, 13 percent were terminated early by the court. *See* Admin. Office of the U.S. Courts, Post-Conviction Supervi-

sion, Table E-7A, *available at* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2014/appendices/E7ASep14.pdf. Approximately 68 percent of supervised release cases closed during the same period were closed "successfully", i.e., terminated (whether early or not) without revocation. *Id*. Approximately 61.3 percent of the supervised release violations during this period were for "technical violations" (such as failure of a drug test, failure to report to a supervising probation officer, or non-payment of financial conditions), 32.3 percent were for "major" violations (i.e., criminal offenses with a sentence of more than 90 days imprisonment), and 6.4 percent were for "minor" violations (i.e., criminal offenses with a sentence of 90 days or less of imprisonment). *Id*.

The three cases here concern legal issues arising at the original sentencing hearing, when the sentencing judge imposed a term of supervised release and selected the conditions and length of the term. We organize our discussion of the defendants' challenges around four general principles sentencing judges should consider when imposing conditions of supervised release: (1) the importance of advance notice of conditions being considered; (2) the need to justify the conditions and the length of the term at sentencing by an adequate statement of reasons, reasonably related to the applicable § 3553(a) factors; (3) the goal of imposing only specific, appropriately-tailored conditions—which is to say, avoiding the imposition of vague or overbroad conditions; and (4) the requirement to orally pronounce all conditions, with the written judgment only clarifying the oral pronouncement in a manner that is not inconsistent with an unambiguous oral provision. Prior to turning to the defend-

ants' challenges, we outline the history and offenses of the three defendants at issue.

## II. Defendants' History and Offenses

### A. Jeffrey Jurgens

Defendant Jeffrey Jurgens is the product of a deplorable childhood. He grew up in a rural Illinois house that was strewn with garbage due to his mother's hoarding; based upon the photos admitted at sentencing, his childhood home more closely resembled a landfill than a house. Jurgens' mother was a neglectful alcoholic who "always had a beer in her hand," and his father, also an alcoholic, abused her until they divorced when Jurgens was nine. No one taught Jurgens proper hygiene, and he was teased and bullied at school because he was dirty and smelled. Despite his up-bringing, Jurgens graduated from high school in 2003 and from DeVry University in 2005 with an associate's degree. He continued to live with his mother until she died in 2007.

At the time of his mother's death, Jurgens was 23. He moved into his own apartment and got a job with a tech company as a help-desk technician. He held that job for nearly six years until his arrest and detention in this case in 2013. During that time, he suffered severe social anxiety, left his apartment only for work and groceries, and allowed gar-bage to accumulate in his apartment because he feared en-countering other people when he took out the trash. He had occasional social contact with co-workers, but he has never dated or had an intimate relationship.

Beginning in about 2007, Jurgens developed an interest in pre-pubescent and adolescent girls and in child pornogra-phy. For the next five years, he used file-sharing software to

find child pornography and downloaded files to his computer hard drives. On February 17, 2012, a Moline, Illinois, police detective executed a search warrant at Jurgens' apartment and seized three computer hard drives containing 69 videos of child pornography. After waiving his *Miranda* rights, Jurgens told the detective that he had been watching child pornography for about five years and knew it was illegal. Jurgens said he did not pursue or have any contact with minors. He said, "I can't do anything when they are not here."

On September 25, 2013, a grand jury charged Jurgens with one count of receipt and distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A), and one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). On October 24, 2013, Jurgens pleaded guilty to both counts without a written plea agreement.

On January 15, 2014, a probation officer filed an initial presentence report, which was later revised on March 13, 2014, to reflect Jurgens' objections. The report stated that the statute required a minimum sentence of five years' imprisonment and a supervised-release term of five years to life on each count. The report indicated that the advisory guidelines range was 151 to 188 months of imprisonment and the guidelines recommended a life term of supervised release. The report stated, "[i]n addition to standard conditions of supervised release … found at U.S.S.G. § 5D1.3, the Court may impose the following special conditions," and listed seven "special conditions." An addendum to the report indicated that Jurgens objected to five of the proposed special conditions.

At a hearing originally scheduled for sentencing, the district court ordered Jurgens to undergo a psychosexual evaluation and reset the date for sentencing. A licensed counselor later diagnosed Jurgens with pedophilic disorder and social anxiety disorder. The counselor recommended the same conditions of "community supervision" that the presentence report listed and recommend that Jurgens receive counseling to address his social anxiety in addition to sex offender treatment.

At the sentencing hearing on June 26, 2014, Jurgens' attorney objected to the proposed conditions of supervised release which use "these very broad and vague terms about 'sexual arousal' and 'pornography' and the like." Jurgens' attorney asked that the court fashion the conditions to "allow for Mr. Jurgens to have contact with minors who are relatives of his and allow him to have contact with minors that are incidental to employment." Jurgens' attorney then spoke of the "irrationality" of U.S.S.G. § 2G2.2,[3] which produced a guidelines range of 151 to 188 months of imprisonment for Jurgens, and requested a sentence of 60 months of imprisonment and 10 years of supervised release. The government attorney requested a sentence of 108 months of imprisonment and 20 years of supervised release.

After hearing from Jurgens himself, the district judge addressed Jurgens' offense in relation to other offenders, the harm to the victims, aggravating factors, and Jurgens' personal history and characteristics. The district judge then im-

---

[3] *See generally United States v. Maulding*, 627 F.3d 285, 287–88 (7th Cir. 2010) (collecting cases addressing similar arguments).

posed a sentence of 72 months of imprisonment and 20 years of supervised release. The judge imposed 13 standard conditions with no discussion, and six special conditions with discussion of each. The judge rewrote certain proposed special conditions to accommodate the objections raised by Jurgens' counsel, and did not impose the special condition proposed by probation that Jurgens refrain from using the Internet for the purpose of sexual arousal.

Jurgens appeals, contending that the district judge procedurally erred when she imposed 20 years of supervised release without addressing his request for 10 years or making appropriate findings. On appeal, Jurgens also challenges each of the 19 standard and special conditions of supervised release on the basis that they were imposed without appropriate findings and are impermissibly vague and overbroad.

### B.  Parrish Kappes

The details of Defendant Parrish Kappes' childhood are different from Jurgens', but the themes are similar. Kappes' parents separated when he was an infant, and his mother took him to live in Arizona. In 1972, when Kappes was six years old, he flew alone to Illinois, where his father and grandmother lived. He had been physically abused and neglected by his mother, and he "looked rough" when he arrived in Illinois. He was given the choice of living with his father or grandmother, and he chose the latter, feeling that his father had earlier abandoned him. He lived with his grandmother for most of the next 40 years until his arrest and detention in this case. Kappes had not seen his mother since he was a child, and he told the probation officer during a pre-sentence interview that he could not remember his mother's name. Although Kappes graduated from high

school, he finished near the bottom of his class, and he told the probation officer he was illiterate. Although he maintained steady employment from 2006 to 2012, he grew "accustomed to being alone" and had difficulty socializing.

On October 15, 2012, law enforcement agents executed a search warrant at the Tuscola, Illinois, house that Kappes shared with his then-93-year-old grandmother. The agents found 2,319 images and 182 videos of child pornography on Kappes' computer. Agents also found images taken by Kappes of a 17-year-old female in a bikini. After waiving his *Miranda* rights, Kappes admitted that he had been taking pictures of this female and others while they played in an outdoor pool adjacent to his home since the girl was approximately seven or eight years old. In a footlocker, the agents found over 30 pairs of children's underwear which Kappes claimed to have stolen 20 years earlier when he worked as a furniture deliveryman.

Kappes was charged with three counts of distributing child pornography and one count of possessing child pornography. After hearing two days of evidence, a jury found Kappes guilty on all counts. The presentence report stated that the guidelines range was 210 to 240 months of imprisonment and five years to life of supervised release. The report stated, "[i]n addition to standard conditions of supervised release … found at U.S.S.G. § 5D1.3, the Court may impose the following special conditions," and listed seven special conditions which largely mirrored those recommended in Jurgens' presentence report. An addendum to the report stated that Kappes' attorney had no objections to the report.

At sentencing, Kappes' attorney reiterated that Kappes had no objections to the presentence report. Counsel for the government requested a sentence of 240 months of imprisonment and 25 years of supervised release. Government counsel said she was requesting the statutory maximum because of, among other reasons, the graphic and violent images in Kappes' child pornography collection. Kappes' counsel commented upon Kappes' positive employment record and record of caring for his grandmother. Kappes declined to speak.

The district judge then discussed the "horrendous" nature and circumstances of the offense, and the "disturbing" character and history evidence of "taking pictures of neighbors' children and saving panties for 20 years." The district judge imposed a sentence of 240 months of imprisonment and 25 years of supervised release. The judge imposed 13 standard conditions and the seven special conditions recommended in the presentence report.

Kappes appeals, contending that the district court erred by imposing (1) four special conditions which were not adequately supported by specific findings and are impermissibly vague or overbroad, (2) two special conditions which required Kappes to pay for court-ordered treatment and testing, and (3) three special conditions which appeared in the written judgment but were not orally pronounced at sentencing.

### C. David Crisp, Jr.

Defendant David Crisp, Jr. ("Crisp") followed in the footsteps of his father, David Crisp, Sr. At the time Crisp was charged in this case with possession with intent to dis-

tribute crack cocaine, his father was serving a sentence in federal prison for similar crack cocaine trafficking offenses. Crisp later reported to probation that his father was involved in his life when he was not incarcerated; however, "he was incarcerated frequently." Crisp likewise was involved in his children's lives when not incarcerated; he claimed to have committed the instant offense because he wanted to raise his one-year-old daughter and five-year-old step-son in "relative comfort" and "the minimum wage job of $8.25 an hour was just not cutting it." Like his father before him, Crisp—35 years old at the time of his last arrest—had amassed a substantial criminal history consisting of 32 arrests and 24 convictions (including four drug felonies) during the previous 18 years.

Crisp pleaded guilty without a written plea agreement. The presentence report stated that the guidelines range was 262 to 327 months of imprisonment and eight years of supervised release. The report stated, "[i]n addition to standard conditions of supervised release … found at U.S.S.G. § 5D1.3, the Court may impose the following special conditions," and listed four special conditions. An addendum to the report stated that Crisp's attorney had no objections to the report.

On May 15, 2014, Crisp was sentenced in the same courtroom where his father was sentenced in 2011. At the outset of sentencing, defense counsel reiterated that she had no objections to the presentence report. Government counsel then recommended a sentence of 286 months of imprisonment and 10 years of supervised release. Defense counsel argued that, despite Crisp's failure to enter into a plea agreement, "the Court can still consider the timeliness of [Crisp's] coop-

eration, the fact that he did render a proffer that was lengthy … and he did accept responsibility in a very, very quick manner." Defense counsel asked the district judge "to depart from the bottom of the guideline range to the maximum amount that the Court feels is appropriate."

After hearing from Crisp, the district judge discussed Crisp's criminal history and said that his career offender status pursuant to the guidelines was appropriate. The judge said that Crisp had "rehabilitative potential" based upon Crisp's allocution at sentencing and his "exceptional acceptance of responsibility." The judge imposed a sentence of 240 months of imprisonment and eight years of supervised release. The judge imposed 13 standard conditions and the four special conditions recommended in the presentence report.

Crisp appeals, contending that the district court erred by (1) imposing three conditions of supervised release which were not adequately supported by specific findings and are impermissibly vague or overbroad; and (2) failing to comment upon Crisp's cooperation with law enforcement as a substantial mitigating factor.

### III.  Advance Notice of the Conditions

The first general principle sentencing judges should consider when imposing conditions of supervised release is that it is important to give advance notice of the conditions being considered. In most instances, this principle fits into the category of recommended "best practice" rather than mandatory requirement. Advance notice is only *required* of supervised release conditions that are not listed in a statute or the guidelines. *United States v. Thompson*, 777 F.3d 368, 377 (7th

Cir. 2015) (collecting cases). This is because "[d]efendant and lawyer are charged with knowledge of the sentencing guidelines, which list the standard conditions along with a number of special ones." *United States v. Bryant*, 754 F.3d 443, 446 (7th Cir. 2014).

Despite this charged knowledge, we have suggested that sentencing judges require the probation office to include any recommended conditions of supervised release—and the reasons for the recommendations—in the presentence report that is disclosed to the parties prior to the sentencing hearing. *See Thompson*, 777 F.3d at 377; *Siegel*, 753 F.3d at 716–17. We also have suggested, as a matter of "best practices," that sentencing judges: (a) send a list of the conditions that the judge is contemplating (including the reasons) to the parties prior to the sentencing hearing; and/or (b) explain at the sentencing hearing what conditions the judge is inclined to impose and why, then ask the parties whether they object to any of them or have a reasonable need for more time to decide whether to object, and adjourn the hearing if necessary. *Thompson*, 777 F.3d at 377. An exception to these "best practice" suggestions would be conditions of supervised release which are "administrative requirements applicable whenever a term of supervised release is imposed," such as "requiring the defendant to report to his probation officer, answer the officer's questions, follow his instructions, and not leave the judicial district without permission." *Thompson*, 777 F.3d at 378. "Once the judge has explained why supervised release is necessary, he should be permitted to impose the necessary incidents of supervision without explanation." *Id.*

The goal of providing the parties with advance notice of the conditions at issue is to allow the parties to present an

informed response. *Cf. Irizarry v. United States*, 553 U.S. 708, 715 (2008) ("Sound practice dictates that judges in all cases should make sure that the information provided to the parties in advance of the [sentencing] hearing, and in the hearing itself, has given them an adequate opportunity to confront and debate the relevant issues."); *United States v. Scott*, 316 F.3d 733, 735 (7th Cir. 2003) ("Knowledge that a condition of this kind was in prospect would have enabled the parties to discuss such options intelligently."). To the extent not required by rule or the sentencing judge, we recommend that defense counsel and government counsel make recommendations and/or objections regarding the proposed conditions of supervised release in advance of the sentencing hearing. *Cf.* Fed. R. Crim. P. 32(f)(1) (requiring parties to state in writing any objections to the presentence report within 14 days of receipt).

Jurgens' sentencing offers an example of the utility of advance notice by probation and timely objections by the defendant. Jurgens objected to four of the special conditions proposed in the presentence report, and the sentencing judge responded by changing the language in three of the objected-to conditions and declining to impose the fourth one entirely. It is our hope that the combination of advance notice, timely objections, and appropriate judicial response to the objections will result in conditions better tailored to fulfill the purposes of supervised release, less confusion and uncertainty, and perhaps—Jurgens' case notwithstanding—fewer appeals.

The issue of advance notice of the proposed conditions is potentially relevant to our standard of review. *See United States v. Farmer*, 755 F.3d 849, 853 (7th Cir. 2014) ("[I]t seems

problematic to conclude that the defendant waives objections to special conditions if he does not properly confront conditions presented for the first time at the sentencing hearing."). "We recently recognized some tension in our cases as to the proper standard of review" when a defendant fails to "object" (or, more accurately, take "exception") *after* the sentencing judge imposes a condition to which the defendant had no notice, because, for example, the probation officer did not recommend it. *United States v. Shannon*, 743 F.3d 496, 499 (7th Cir. 2014) (collecting cases). In general, our rule has been that the imposition of contested conditions are reviewed for an abuse of discretion, while uncontested conditions are reviewed for plain error. *United States v. Ross*, 475 F.3d 871, 873 (7th Cir. 2007); *cf. United States v. Baker*, 755 F.3d 515, 522 (7th Cir. 2014) (allegations of procedural error, such as whether a judge adequately explained his chosen sentence, are reviewed *de novo*). Under either standard of review, we must be mindful of the fact that "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case," and "district courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do." *Gall v. United States*, 552 U.S. 38, 51–52 (2007) (quotations and alterations omitted).

The government contends that Jurgens, Kappes and Crisp received notice of the conditions they now challenge because all challenged conditions were recommended in the respective presentence reports. Accordingly, the government contends that plain error review is appropriate in each case because Kappes and Crisp did not object to the presentence report and each of Jurgens' objections were accommodated

by the conditions ultimately imposed by the sentencing judge. Kappes concedes that plain error review applies to his vagueness and overbreadth challenges. Jurgens argues that abuse of discretion review is appropriate to his challenges of the standard conditions because the presentence report merely incorporated the standard conditions by reference, rather than listing each standard condition in the report itself. Crisp offers no opinion on the standard of review, arguing that the errors are reversible regardless of the standard of review.

We find that, with respect to the challenges we consider here, the outcome is the same regardless of the standard of review. *See United States v. Hinds*, 770 F.3d 658, 665 (7th Cir. 2014) (same); *Farmer*, 755 F.3d at 854 (same); *Shannon*, 743 F.3d at 500 (same). Despite this finding, we caution future defendants against withholding objections under the belief that we will continue to treat the abuse-of-discretion and plain-error standards of review as functionally interchangeable in this context. Under plain-error review, unlike abuse-of-discretion review, we are permitted but not required to order correction of an error.[4] *United States v. Olano*, 507 U.S. 725, 735 (1993) ("[Federal Rule of Criminal Procedure] 52(b) [governing plain error] is permissive, not mandatory. If the forfeited error is plain and affects substantial rights, the court of appeals has authority to order correction, but is not

---

[4] An argument could be made that a sentencing judge may adopt any unobjected-to conditions in the presentence report without the need to make findings. *Cf.* Fed. R. Crim. P. 32(i)(3)(A) (a sentencing judge may accept any undisputed portion of the presentence report). Because the issue has not been raised by the parties, we do not consider it here.

required to do so." (quotation omitted)). A sentencing hearing is not meant to be a dress rehearsal.

## IV. Statement of Reasons and Appropriate Tailoring

The second principle—justifying the conditions by an adequate statement of reasons—and the third—imposing appropriately-tailored conditions—are interrelated. Accordingly, after outlining the parameters of each principle, we discuss the defendants' challenges to specific conditions in connection with both rules.

### A. Statement of Reasons

The second general principle regarding the imposition of conditions of supervised release that we address is that a sentencing court must justify the conditions and the length of the term at sentencing by an adequate statement of reasons, reasonably related to the applicable § 3553(a) factors. *See Bryant*, 754 F.3d at 445. This "allow[s] for meaningful appellate review"; it "promote[s] the perception of fair sentencing"; and it is a vital element in maintaining the "uniform and constant" principle in the federal judicial tradition that "the sentencing judge … consider[s] every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 50, 52 (quotation omitted).

The applicable factors are set out in 18 U.S.C. §§ 3553(a) and 3583(c)–(d). Section 3583(d) places the factors into three groups. First, the conditions of supervised release "must be reasonably related to (1) the defendant's offense, history and characteristics; (2) the need for adequate deterrence; (3) the need to protect the public from further crimes of the defend-

ant; and (4) the need to provide the defendant with treatment." *United States v. Angle*, 598 F.3d 352, 360–61 (7th Cir. 2010); *see* 18 U.S.C. § 3583(d)(1). Next, the conditions "cannot involve a greater deprivation of liberty than is reasonably necessary to achieve the goal of deterrence, incapacitation, and rehabilitation." *United States v. Goodwin*, 717 F.3d 511, 522 (7th Cir.), *cert. denied*, 134 S. Ct. 334 (2013); *see* 18 U.S.C. § 3583(d)(2). Finally, the conditions must be consistent with any pertinent statement that the United States Sentencing Commission issues.[5] 18 U.S.C. § 3583(d)(3); *cf. Siegel*, 753 F.3d at 708 (noting that, logically, this factor is not applicable to conditions already listed in the guidelines). Unfortunately, applying this "vague and general" list of unweighted factors to a specific case is unwieldy in practice, "and cannot yield an objective result." *Siegel*, 753 F.3d at 707.

The judge need not address every factor "in checklist fashion, explicitly articulating its conclusions regarding each one." *Shannon*, 518 F.3d at 496; *see United States v. Starko*, 735 F.3d 989, 992 (7th Cir. 2013) ("Courts do not have to engage in a discourse of every single § 3553(a) factor; however, it is also the case that a rote statement that the judge considered all relevant factors will not always suffice." (quotation omitted)). "[T]he court may simply give an adequate statement of

---

[5] The statute requires that each discretionary condition be "consistent with any pertinent policy statements" by the Sentencing Commission. 18 U.S.C. § 3583(d)(3). The defendants in these cases appear to argue that a sentencing judge is *required* to identify a particular policy statement issued by the Sentencing Commission prior to imposing any discretionary condition of supervised release. We do not agree. However, if a challenged condition is *inconsistent* with a pertinent policy statement, then the condition would violate § 3583(d)(3).

reasons, consistent with § 3553(a), for thinking the sentence it selects is appropriate." *Shannon*, 518 F.3d at 496. "[T]he more onerous the term [of supervised release], the greater the justification required—and … a term can become onerous because of its duration as well as its content." *United States v. Quinn*, 698 F.3d 651, 652 (7th Cir. 2012); *cf. Gall*, 552 U.S. at 50 ("We find it uncontroversial that a major departure [from the guidelines range] should be supported by a more significant justification than a minor one."). "Special" conditions often require more justification than "standard" conditions—but not always—and a condition's label in the guidelines is ultimately irrelevant. *All* discretionary conditions, whether standard, special or of the judge's own invention, require findings. *See Bryant*, 754 F.3d at 445. We emphasize that the judge need not give a speech about each condition, but conversely, we believe sentencing judges rarely, if ever, should list a multitude of conditions without discussion. This rule, however, is subject to a harmless error analysis. *See Siegel*, 753 F.3d at 713.

The fact that a sentencing judge may reduce or modify terms of supervised release at any time, *see* 18 U.S.C. § 3583(e)(2), may lead the judge to resolve uncertainties at the time of sentencing in favor of a long but reducible period. "[S]till this is a subject that requires an explicit decision by the judge after considering the defendant's arguments." *Quinn*, 698 F.3d at 652. We also have advised sentencing judges to "consider the possibility of setting sunset dates for some of the more onerous terms, so that [the defendant] can regain more control of his own activities without needing a public official's advance approval, while enough supervision remains to allow intervention should [the defendant] relapse." *Id*. at 652–53. In *Quinn*, we vacated a term of super-

vised release and remanded for resentencing when the judge rejected the defendant's request for a 10-year term of supervised release and instead imposed a lifetime term without discussion of the length of defendant's supervision, the terms that he would be required to follow, or much of the defendant's evidence that he presented a lower-than-normal risk of recidivism. *See id*. at 652.

Jurgens contends that the sentencing judge erred in imposing a 20-year term of supervised release without discussion of his request for a 10-year term. Jurgens points to the statement in *Quinn* that it is not sufficient to simply choose a supervised release term within the guidelines range; "a judge still must consider a defendant's serious arguments for a sentence below the Sentencing Commission's recommendations." *Id*. Jurgens contends that we should vacate the 20-year term and "remand with instructions that the district court consider the § 3583(c) factors when addressing Mr. Jurgens's requested 10 year term of supervised release."

The Sentencing Commission recommends the statutory maximum term of supervised release for every sex offense, *see* U.S.S.G. § 5D1.2(b)(2), and any sentence within the guidelines range is "entitled to a presumption of substantive reasonableness." *Quinn*, 698 F.3d at 652 (citing, *inter alia*, *Rita v. United States*, 551 U.S. 338 (2007)). The 20-year supervised-release term Jurgens received is below the statutory maximum of life and thus below the term recommended by the Sentencing Commission. However, even in this situation, while the sentencing judge "need not discuss each section 3553(a) factor at sentencing and need not respond to every pithy argument that a defendant raises," a defendant is enti-

tled to a discussion of his "principal" arguments. *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009).

Prior to sentencing, Jurgens submitted a 21-page "commentary on sentencing factors." This document contains extensive discussion of factors favoring leniency in the term of imprisonment, culminating with a request for a custodial sentence of 60 months. The document contains a brief discussion of supervised release, focused exclusively on his objections to four terms of supervised release recommended in the presentence report. The document contains no recommendation as to—or even mention of—the *length* of the term of Jurgens' supervised release. Jurgens' objections in the addendum to the presentence report likewise contain nary a mention of the length of supervised release. In his remarks at the sentencing hearing, Jurgens' counsel spoke expansively on Jurgens' history and need for sex-offender treatment, the irrationality of the guidelines imprisonment-range, and the lack of evidence of "hands-on sex offenses." At the conclusion of his remarks, after asking for 60 months in custody, Jurgens' counsel devoted a single sentence to the length of the term of supervised release: "We ask for a ten-year period of supervised release with appropriate conditions therein."

In this context, we do not consider Jurgens' request for a 10-year term to be one of his "principal" arguments, requiring discussion by the sentencing judge. *Villegas-Miranda*, 579 F.3d at 801. We find that the judge did not err in focusing her discussion on the topics focused upon by Jurgens' counsel. Of course, a sentencing judge must always adequately explain his or her choice as to the length of custody and supervised release, consistent with the relevant § 3553(a) factors. *See Farmer*, 755 F.3d at 852. In this case, we find that was

done, particularly given that the length of custody and supervised release were both significantly below the guidelines range. *Cf. Quinn*, 698 F.3d at 652 (more onerous terms require greater justification, and "a term can become onerous because of its duration as well as its content"). The judge chose to discuss her reasons for imposing the sentence as a whole, and we find this to be a reasonable choice in this case. The judge discussed Jurgens' troubled personal history and characteristics and also discussed her "concern" that, after he was caught but prior to incarceration, he continued to watch "simulated depictions" of child pornography. Moreover, even if the judge erred by not adequately explaining her decision to follow the six-year custodial sentence (near the low end of the statutory range) with 20 years of supervised release (meaning Jurgens will complete his supervised release when he is approximately 54 years old), we find this error to be harmless in this case. "[A] district court may find it proper to impose a longer term of supervised release to follow a relatively shorter term of imprisonment," *United States v. Albertson*, 645 F.3d 191, 198 (3d Cir. 2011), and that is what the sentencing judge did in this case.

Jurgens also argues that the sentencing judge erred by failing to provide an adequate statement of reasons for each of the 19 standard and special conditions of supervised release the judge imposed. We address those arguments below in conjunction with our discussion of the individual conditions.

### B.   Specific, Appropriately Tailored Conditions

The third sentencing principle we address is that sentencing judges should impose conditions of supervised release which are (a) appropriately tailored to the defendant's of-

fense, personal history and characteristics; (b) involve no greater deprivation of liberty than is reasonably necessary to achieve the goals of deterrence, protection of the public, and rehabilitation; and (c) sufficiently specific to place the defendant on notice of what is expected. *See Adkins*, 743 F.3d at 196 (discussing "the importance of notice and reasonably narrow tailoring," in crafting conditions of supervised release); *Goodwin*, 717 F.3d at 525 ("[E]ach special condition imposed must be tailored to Goodwin and his needs and involve no greater deprivation of liberty than is reasonably necessary to achieve the goals of deterrence, protection of the public, and rehabilitation." (citation omitted)); *United States v. Schave*, 186 F.3d 839, 843 (7th Cir. 1999) ("A condition of supervised release is unconstitutionally vague if it would not afford a person of reasonable intelligence with sufficient notice as to the conduct prohibited."). This rule functions as a limit to a sentencing judge's "wide discretion in determining conditions of supervised release." *Adkins*, 743 F.3d at 193 (quotation omitted).

We have recognized "the difficulty of drafting special conditions." *Id*. at 196. We have suggested that sentencing judges define the crucial terms in a condition in a way that "provides clear notice to [the defendant] (preferably through objective rather than subjective terms)," and/or "includes a mens rea requirement (such as *intentional* conduct)." *Id*. We have further suggested that the judge "[m]ake sure that each condition imposed is simply worded, bearing in mind that, with rare exceptions, neither the defendant nor the probation officer is a lawyer and that when released from prison the defendant will not have a lawyer to consult." *Siegel*, 753 F.3d at 717.

### 1. Standard Conditions

As we have said, the fact that certain non-administrative conditions are labeled "standard" does not render them immune from the requirements that they be adequately supported and not vague or overbroad. *See Thompson*, 777 F.3d at 376–78.

In Jurgens' case, the sentencing judge imposed 13 standard conditions without giving reasons. Jurgens challenges each standard condition as having been improperly imposed without notice and without findings, and further challenges most of them as being vague, overbroad, and/or an excessive deprivation of his liberties. Jurgens first contends that the standard conditions were omitted from the presentence report, which deprived him of notice and an opportunity to object. Jurgens' presentence report referred to the "standard conditions of supervised release … found at U.S.S.G. § 5D1.3." While it would be better practice for probation officers to detail each condition being proposed, along with reasons why they would be applicable in a particular defendant's case, we cannot say that Jurgens was deprived of notice that each of the standard conditions listed in U.S.S.G. § 5D1.3 would be considered by the sentencing judge.

Jurgens finds more solid ground for his contention that the judge imposed 13 standard conditions without making findings consistent with the § 3553(a) factors. With respect to the substantive standard conditions, Jurgens is correct that the sentencing judge imposed them without explanation as to why they were appropriate in Jurgens' case and involved no greater deprivation of liberty than is reasonably necessary to achieve the permissible goals of supervised release. *See Goodwin*, 717 F.3d at 523–24. However, we nonetheless

must look at the conditions to determine whether the failure to give reasons was harmless. *See Siegel*, 753 F.3d at 713. As we did in *Thompson* and *Siegel*, we highlight the ambiguities and/or overbreadth in many of the standard conditions, and suggest modifications for improving them.

The condition forbidding the defendant from "associat[ing] with any persons engaged in criminal activity" and "associat[ing] with any person convicted of a felony, unless granted permission to do so by the probation officer," is "fatally vague" because it appears to impose strict liability and does not define "associate." *Thompson*, 777 F.3d at 376–77. A suggested modification would be to forbid the defendant "to meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity." *Id*. at 377.

The condition that the defendant "refrain from excessive use of alcohol," is vague because "excessive use" is not defined. *Id*. at 376. A suggested definition for "excessive" alcohol use for men is "binge drinking or heavy drinking," with "heavy drinking" being defined as "consuming 15 drinks or more per week." *Siegel*, 753 F.3d at 715 (quotation omitted). While the government points to no evidence contradicting Jurgens' claim he was a teetotaler, the government nonetheless contends the condition banning excessive alcohol use is appropriate because Jurgens is the child of alcoholics. The sentencing judge did not say this, and given the lack of any apparent connection between alcohol use and Jurgens' offense, we think the imposition of this condition without findings was not harmless.

The condition that "the defendant shall support his or her dependents and meet other family responsibilities" is

inappropriate in Jurgens' case because he has no dependents, *see Thompson*, 777 F.3d at 376, and it is not apparent what "other family responsibilities" means, given that it appears to mean something different than "support[ing]" Jurgens' as-yet nonexistent dependents. To the extent the condition requires only financial support, as argued by the government, the condition should make that explicit and should include a limitation which takes into account the defendant's ability to pay. *Cf. Siegel*, 753 F.3d at 714 ("Revoking a defendant's supervised release and recommitting him to prison for mere inability to pay would constitute imprisonment for debt.").

The condition that "the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics" contains numerous ambiguities. "There is no indication of what is meant by 'personal history' and 'characteristics' or what 'risks' must be disclosed to which 'third parties.'" *Thompson*, 777 F.3d at 379. Presumably, the meaning of these terms would change from defendant to defendant, which makes definitions particularly important with this condition.

The condition that the defendant is to notify his probation officer of any "change in ... employment" fails to indicate "whether change in employment just means changing employers or also includes changing from one position to another for the same employer at the same workplace." *Id*. Likewise, the condition requiring the defendant to work "regularly at a lawful occupation" fails to define "regularly."

The condition prohibiting the defendant from "frequent[ing] places where controlled substances are illegally sold, used, distributed, or administered," contains no "indi-

cation of how many trips constitute 'frequent[ing]' such places." *Id*. More importantly, the condition, read literally, improperly imposes strict liability because "there is no requirement that [the defendant] know or have reason to know or even just suspect that such activities are taking place." *Id*. Likewise, the condition that "the defendant shall not leave the judicial district without … permission" would be improved by explicitly adding a scienter requirement, particularly in a case where it is foreseeable that a defendant will reside near the boundary of two judicial districts within the same state.

The condition that "the defendant shall answer truthfully all inquiries by the probation officer" "essentially asks for a waiver of the right not to be forced to incriminate oneself, because the condition would require the defendant to answer 'yes' if he were asked whether he had committed another crime and he had." *Id.* at 379–80. In the context of probation, the Supreme Court has held that a state probation requirement that the probationer "be truthful with the probation officer 'in all matters,'" was insufficient to require *Miranda* warnings because such a condition does not penalize the right to remain silent. *Minnesota v. Murphy*, 465 U.S. 420, 422, 434 (1984). The Court said that the "the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege," but the "probation condition [at issue] proscribed only false statements; it said nothing about [the defendant's] freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id*. at 437, 438. We have interpreted *Murphy* as drawing a line between "a merely plausi-

ble fear that invoking one's Fifth Amendment privilege will get one into trouble with the probation authorities," and "the police tell[ing] the probationer that unless he talks his probation will be revoked." *United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003). The former does not require *Miranda* warnings, while the latter does. *Id*. Because we are remanding for resentencing for other reasons, we decline to decide on which side of the *Murphy* line this condition falls. On remand, Jurgens may request that the standard condition that "the defendant shall answer truthfully all inquiries by the probation officer" should include language indicating that the condition does not prevent the defendant from invoking his Fifth Amendment privilege against self-incrimination. We do not, however, hold here that such language is required.

Jurgens contends that his Fifth Amendment rights also are implicated by the separate standard condition requiring him to "notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer." We do not see how the mere fact of an arrest or law enforcement contact is itself incriminating, and Jurgens points us to no authority so holding. And unlike the previous condition, which *required* "all inquiries" to be answered, there is nothing in this condition which requires the defendant to answer any follow-up questions by the probation officer which may tend to elicit incriminating answers. With respect to the lack of findings to support this condition, we think it is harmless in this instance. Clearly, this condition assists the probation officer in monitoring the defendant's conduct and compliance with the other conditions of release, most notably, the mandatory condition that the defendant commit no other criminal offenses.

Jurgens challenges the standard condition that "the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer" as infringing on his Fourth Amendment right to be free from warrantless nighttime searches. This condition is not as broad as the conditions we vacated in *Farmer*, 755 F.3d at 854–55, and *Goodwin*, 717 F.3d at 523,[6] and thus does not implicate the defendant's Fourth Amendment rights to the same extent. However, the visitation standard condition is nonetheless broadly worded, and "would allow the probation officer to 'visit' the defendant at 3:00 a.m. every morning and look around for contraband, and also allow him to follow the defendant everywhere, looking for contraband." *Thompson*, 777 F.3d at 380. The sentencing judge made no effort to explain why this condition—especially in its current, broadly worded form—is connected to Jurgen's offense, history, and personal characteristics, or how it is reasonably necessary to furthering the deterrence, public protection, and rehabilitation goals referred to in 18 U.S.C. § 3583(d)(2). Given that Jurgens' offense exclusively involved images on a computer—which presumably would not be left in plain view when Jurgens heard a knock on the door—and there is no indication Jurgens has ever possessed any other form of "contraband," there is no readily apparent justification for this condition to be imposed upon Jurgens. Accordingly, we cannot find that the lack of explanation was harmless. *See Thompson*, 777 F.3d at 380 ("Regardless of any possible con-

---

[6] A modified version of that broader search condition was imposed upon Jurgens as a "special condition," and is discussed *infra*.

stitutional concern, [this condition is] too broad in the absence of any effort by the district court to explain why [it is] needed."); *cf. Goodwin*, 717 F.3d at 523 ("Although we stop short of stating that such [search] restrictions could never be appropriate in these circumstances, our skepticism leads us to conclude that the district court must provide some justification for these particular conditions.").

Jurgens contends that the condition prohibiting him from entering "into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court" prevents him "from pursuing a key avenue for reducing his criminal exposure in the event he commits a new crime." But this argument presumes the court unreasonably denies him permission, which seems to be an unlikely enough event that the imposition of this condition does not constitute an abuse of discretion, much less plain error. Moreover, the lack of findings to support this condition is harmless because, although there are occasions "when the law enforcement benefits to the community justify permitting the offender to engage in this high-risk activity," "[a]cting as a confidential informant is generally inconsistent with the rehabilitative and re-integrative goals of supervision." Admin. Office of the U.S. Courts, *Guide to Judiciary Policy*, Vol. 8, pt. E, § 460.60.20 (2011), *available at* https://wvn.fd.org//pdf/Part_E%20109.pdf.

We have focused upon Jurgens' challenges to the standard conditions imposed upon him because Jurgens challenges each of the standard conditions on appeal. The same 13 standard conditions imposed upon Jurgens were imposed upon Kappes and Crisp, with the exception that Crisp was prohibited from "any" use of alcohol instead of "excessive"

use. The ban on "excessive" use of alcohol is the only standard condition challenged on appeal by Kappes, and it must be vacated for the same reasons this condition was vacated as to Jurgens. Because we are ordering a resentencing for Kappes, our comments above regarding the other 12 standard conditions should be considered by Kappes' sentencing judge as well.

On appeal, Crisp challenges the standard conditions banning "any" use of alcohol and requiring him to "support" his dependents and "meet other family responsibilities." Unlike Jurgens and Kappes, there is evidence that Crisp consumed alcohol: he reported to the probation officer that he drank alcohol three to four times a week, but not to intoxication. The sentencing judge imposed the alcohol ban with no explanation for how it connected to Crisp's offense or history. Perhaps a rationale could be offered adequate to support a total or—more likely—an "excessive" alcohol ban, but that rationale is not sufficiently apparent that we may declare harmless the failure to make any findings in support of the condition as written. *See Baker*, 755 F.3d at 524 (vacating a complete ban on alcohol despite defendant's statement that he consumed a six-pack of beer or more twice per week, because "there is no evidence that Baker's alcohol use has contributed to his repeated criminal conduct or that Baker is dependent on alcohol").

The failure to give reasons for imposing the condition requiring Crisp to "support" his dependents and "meet other family responsibilities" was harmless given the central role Crisp's family played in the presentence report and the comments made by the defense and the judge at sentencing. However, our other comments made above regarding this

condition apply with equal force to Crisp. The meaning of the phrase, "other family responsibilities," is not apparent, given that it appears to mean something different than "support[ing]" Crisp's dependents. To the extent the condition requires only financial support, the condition should make that explicit and should include a limitation which takes into account the defendant's ability to pay. As with Kappes, because we are ordering a resentencing for Crisp, our comments above regarding the other 11 standard conditions which were not challenged by Crisp should be considered by Crisp's sentencing judge.

We are not the first court to be presented with at least some of these objections to the standard conditions. "A number of decisions in other circuits brush aside objections to the breadth and ambiguity of the many conditions of supervised release imposed by district judges." *Thompson*, 777 F.3d at 380 (collecting cases). Other courts have interpreted an overbroad or ambiguous condition narrowly, for example, by reading a scienter requirement into a condition that is silent on the issue. *See United States v. Phillips*, 704 F.3d 754, 767–68 (9th Cir. 2012) (construing the standard condition prohibiting the defendant from "frequent[ing] places where controlled substances are illegally sold" as "prohibit[ing] Phillips from *knowingly* going to a specific place where drugs are illegally used or sold, but … not prohibit[ing] him from … going to a given neighborhood simply because a person is selling drugs somewhere within that neighborhood"); *United States v. Green*, 618 F.3d 120, 123 (2d Cir. 2010) (same, regarding a condition prohibiting association with street gangs). Likewise, we have imposed "an appropriate limiting construction" to a condition of supervised release prohibiting a defendant from "associat[ing] … with any member or organ-

ization which espouses violence or the supremacy of the
white race," despite "the absence of an explicit scienter re-
quirement in the restriction." *Schave*, 186 F.3d at 843. Similar-
ly, we have previously decided that the erroneous imposi-
tion of two overbroad conditions does not amount to plain
error requiring our intervention because "conditions of su-
pervised release are readily modifiable at the defendant's
request." *United States v. Silvious*, 512 F.3d 364, 371 (7th Cir.
2008); *accord United States v. McKissic*, 428 F.3d 719, 726 (7th
Cir. 2005) (same, regarding the imposition of a condition
without notice to the defendant).

However, as in *Adkins*, "this is not a case where we can
tweak the relevant condition[s] easily." 743 F.3d at 195 (quo-
tation omitted).We have identified numerous conditions
with troublesome provisions, and "we would need to define
multiple key terms or provide multiple limiting construc-
tions." *Id*. at 196. "[B]ecause the district court will retain ju-
risdiction over this case for many years, including the power
to amend the conditions of supervised release at any time, it
is in a superior position to write a new condition, if it so
chooses." *Id*. (citing 18 U.S.C. § 3583(e)(2)). As for declining
to remand in favor of requiring the defendant to request
modification at a later time, once a defendant is serving su-
pervised release, he typically finds himself without the right
to counsel and may lack the legal sophistication to recognize
the potential infirmities in the conditions he has been or-
dered to obey. Also, in an effort to avoid the ire of the proba-
tion officer and judge who hold his liberty in their hands, the
unrepresented defendant on supervised release may opt to
forgo his right to request modification, and either attempt to
abide by an overbroad condition or ignore the condition and
hope it is not discovered. Accordingly, in this instance, we

find "[i]t is preferable for the district court to specify limitations in a condition of supervised release in the condition itself" at the time of sentencing, rather than leaving it to either the appellate court to introduce limitations or the defendant on supervised release to make a motion for modification. *Thompson*, 777 F.3d at 380.

### 2. Special Conditions
#### a. Bans on Mood-Altering Substances, Pornography, and Internet

Both Kappes and Crisp are subject to special conditions banning the purchase, possession or use of any "mood altering substance." This phrase is not defined nor is its meaning self-evident. *Siegel*, 753 F.3d at 713 ("It could include coffee, cigarettes, sugar, and chocolate, among many others; yet these substances are not causal factors of recidivist behavior."). A better definition for "mood altering substances," although not the only one, would be "psychoactive substances that impair physical or mental functioning, including street, synthetic, or designer drugs." *Id*. (quotation marks omitted). We also have suggested simply prohibiting "*illegal* mood-altering substances." *United States v. Cary*, 775 F.3d 919, 924 (7th Cir. 2015). In Kappes' case, the sentencing judge offered no reasons for imposing the condition, and the record offers no indication Kappes has ever used psychoactive substances, so we cannot say that the lack of findings as to this condition was harmless. Therefore, Kappes' special condition number one is vacated. The same condition also contains limitations on the use of alcohol (a total ban for Crisp and a ban on "excessive" use for Kappes), and our comments made above related to the standard condition limiting the use of alcohol apply with equal force to this duplicative

special condition. The special condition also permits testing for use of alcohol, but to the extent the defendant is *allowed* to consume non-excessive amounts of alcohol, the sentencing judge should indicate the purpose of this testing if this condition is reimposed in some form. *See Baker*, 755 F.3d at 525; *Siegel*, 753 F.3d at 716.

Kappes is subject to special condition numbers four and seven, banning him from receiving or viewing "any material, legal or illegal, that contains pornography," and forbidding him from "us[ing] the Internet … for the purpose of sexual arousal." "Adult pornography, unlike child pornography, enjoys First Amendment protection, and so we must be especially cautious when considering a ban on possessing adult pornography." *Shannon*, 743 F.3d at 500. We have found that special conditions such as Kappes' special condition numbers four and seven do not survive a vagueness or overbreadth challenge, irrespective of whether plain-error review or abuse-of-discretion review applied. *See id.*; *Adkins*, 743 F.3d at 194; *Goodwin*, 717 F.3d at 525. We again so find here.

In Jurgens' case, the presentence report recommended the identical pornography and Internet-usage conditions imposed upon Kappes, but the sentencing judge declined to impose the Internet-usage condition and modified the pornography condition to prohibit Jurgens from receiving or viewing "any material, legal or illegal, that contains illegal pornography as that is defined in the U.S. Code." Despite the sentencing judge's modifications, Jurgens complains that the reference to "legal" material is "plainly a scrivener's error," and the condition is "redundant given that the mandatory condition banning the commission of federal or state

offenses prohibits the [same] conduct." Jurgens is correct, but any error is harmless. Moreover, given Jurgens' offense, the sentencing judge may have wished to emphasize that Jurgens is prohibited from possessing illegal pornography. If so, the sentencing judge may make that clear on remand.

### b. Treatment Programs and Computer Monitoring

Jurgens is required by special condition numbers one, two, and five to participate in "psychiatric services and/or a program of mental health counseling and treatment," "sex offender treatment," and probation's "Computer and Internet Monitoring Program." Jurgens contends on appeal that these special conditions are greater than necessary deprivations of his liberty and were not supported by adequate findings.

With respect to the conditions requiring mental-health counseling and treatment and sex-offender treatment, Jurgens did not object to these special conditions despite their appearance in the presentence report. Jurgens himself told the sentencing judge: "I want to use this as an opportunity to turn my life around by making use of any and all education, counseling and guidance that is made available to me."[7] Prior to sentencing, the judge ordered a psychosexual evaluation of Jurgens. Jurgens was diagnosed with an anxiety disorder and a pedophilic disorder. Jurgens' attorney emphasized Jurgens' "abusive childhood situation," requested

---

[7] Jurgens came close to waiving this challenge. *See Cary*, 775 F.3d at 927 ("We will not second-guess conditions of supervised release imposed consistent with an offender's request in the district court.").

a "ten-year period of supervised release with appropriate
conditions," and asked for Jurgens to be housed in a prison
where "he gets the benefit of sex offender … treatment." The
sentencing judge then commented upon Jurgens' wretched
childhood wherein Jurgens "never learned to value
[him]self" and attributed Jurgens' anxiety disorder to his
childhood. The judge commented on her concern that, after
being caught with child pornography but prior to his arrest
and incarceration, Jurgens collected anime, which is "just
animated, simulated depictions of the same kinds of things
that … you understood you could no longer look at." The
judge found that the length of time Jurgens viewed the vide-
os depicting child pornography and the nature of the images
were aggravating factors. The judge ordered the mental-
health treatment and sex-offender treatment conditions "be-
cause of the information contained about your mental health
in the [presentence report] and also in the psychosexual
evaluation regarding concerns about pedophilia, [and] also
concerns about your high level of social anxiety and avoid-
ance issues." We find that these findings are sufficient pur-
suant to § 3583(d) to survive plain-error or abuse-of-
discretion review of both conditions.[8] *See Evans*, 727 F.3d at
733–35; *Ross*, 475 F.3d at 875.

---

[8] We have encouraged judges to "consider the possibility of setting sun-
set dates for some of the more onerous terms." *Quinn*, 698 F.3d at 652.
Although we find no plain error in the imposition of the treatment con-
ditions for the full term of Jurgens' supervised release, on remand the
sentencing judge may consider imposing sunset dates on the treatment
conditions. If treatment continues to be warranted beyond the sunset
dates, the term may be extended. *See Thompson*, 777 F.3d at 375.

On appeal, Jurgens takes particular exception to the condition that he "will submit to physiological testing, including polygraph testing, which may be part of a sex offender treatment program as directed by the U.S. Probation Office."[9] Jurgens contends that physiological testing includes plethysmograph testing,[10] which he contends is a greater than necessary deprivation of his liberty interests. Plethysmograph testing is physically intrusive and controversial, but it "has been recognized by some psychologists and researchers as a useful technique in the *treatment* of sexual offenders," *United States v. Weber*, 451 F.3d 552, 565 (9th Cir. 2006), and "courts have upheld conditions requiring offenders to undergo [plethysmograph] testing under various legal challenges." *United States v. Rhodes*, 552 F.3d 624, 626 (7th Cir. 2009). To the extent this condition might require Jurgens to submit to plethysmograph testing—which is not mentioned in the condition—it involves too many contingencies to make the issue ripe for review at this time. *See id.* at 628–29 (holding that the defendant's challenge to a similar condition was not ripe for review because it is "based on a number of contingencies," including that the treatment program

---

[9] The condition as a whole reads: "You shall participate in a sex offender treatment program as deemed necessary by the U.S. Probation Office. You shall pay for such services, if financially able, as directed by the U.S. Probation Office. You will submit to physiological testing, including polygraph testing, which may be part of a sex offender treatment program as directed by the U.S. Probation Office. You shall pay for such services, if financially able, as directed by the U.S. Probation Office."

[10] Plethysmograph testing involves placing a device on a man's penis in order to measure his sexual response to various visual and auditory stimuli. *See United States v. Weber*, 451 F.3d 552, 561–62 (9th Cir. 2006).

may only require "polygragh testing alone, which is not un-usual," and/or "the development of science or the law may render the [plethysmograph] testing irrelevant or even ille-gal, or maybe the movement will be in a different direction altogether"). If Jurgens ultimately is ordered to undergo ple-thysmograph testing as part of a sex offender treatment pro-gram on supervised release, he may petition the district court to modify the condition if he then objects to it. *See id*. at 629.

As for polygraph testing, which is mentioned in the con-dition (although as a contingency), Jurgens contends this possibility infringes on his Fifth Amendment right to be free from self-incrimination. Our earlier discussion related to Jurgens' prior Fifth Amendment challenge applies with equal force here. A defendant on supervised release retains the privilege to invoke his Fifth Amendment rights. On re-mand, Jurgens may request that the sentencing judge in-clude language indicating that this condition does not pre-vent him from invoking the privilege against self-incrimination, although we do not hold that such language is required. Jurgens also contends that the condition gives "the probation office 20 years of unlimited ability to test" Jurgens with a polygraph. However, we read this condition as delegating to probation the selection of the treatment pro-vider; only the treatment provider is authorized to select the type(s) and amount of testing. We encourage the sentencing judge on remand to consider rewording the condition to make this point clear. *Cf. Siegel*, 753 F.3d at 713 (addressing issues with, and ambiguities in, a similarly worded condi-tion).

Jurgens also challenges the condition requiring him to participate in probation's "Computer and Internet Monitoring Program." A similar condition was proposed in the presentence report. *See* U.S.S.G. § 5D1.3(d)(7). The proposed condition required Jurgens to install, "on any computer" he used, filtering software that would "monitor/block access to sexually oriented websites." Jurgens objected because he planned to use computers on his job and the term "sexually oriented" was vague and overbroad. The sentencing judge accommodated Jurgens' objections by replacing the term "sexually oriented websites" with "websites that contain illegal child, or illegal pornography," and adding a clarification that the condition applies only to "personal computers" and not to any computer Jurgens needs to access through his employment.[11] The judge explained at sentencing that the

---

[11] The condition reads in full:

> You shall participate with the U.S. Probation Office's Computer and Internet Monitoring Program during your term of supervision. This shall apply to any personal computers that you have, not to any computers that you need to access through your employment. The monitoring program will start as soon as possible after your supervision term begins. You shall sign the rules of the Computer and Internet Monitoring Program and comply with the conditions of this program. During this time, you shall install filtering software on any computer you possess or use which will monitor and block access to any websites that contain illegal child, or illegal pornography. You shall allow the U.S. Probation Officer and Office unannounced access to any computer you possess or use, other than that you use through your employment, to verify that the filtering software is func-

condition was necessary to help ensure compliance with the other conditions of supervised release.

Jurgens contends that the judge's findings were inadequate to support this condition. We disagree. Jurgens' use of a computer facilitated his offense, and the sentencing judge reasonably found that the monitoring program will "ensure compliance" with the other conditions, most notably the condition prohibiting Jurgens from receiving, transmitting, or viewing illegal pornography. The deterrent effect of filtering software—and unannounced checks to determine the software remains functional—is apparent. "[W]e try to take careful note of context and the practical realities of a sentencing hearing. District judges need not belabor the obvious. The judge need not be explicit where 'anyone acquainted with the facts would have known without being told why the judge had not accepted the argument' …." *United States v. Gary*, 613 F.3d 706, 709 (7th Cir. 2010) (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). Moreover, we endorse the sentencing judge's efforts to respond to the objections Jurgens made at sentencing. We find that the modified condition was adequately supported by the sentencing judge.

Jurgens also argues that this condition violates his Fourth Amendment rights because it permits the probation officer unlimited, unannounced access to Jurgens' personal computer(s) "to verify that the [child pornography] filtering software is functional." Jurgens characterizes this condition

---

tional. You shall pay of [sic] the cost of this software, if financially able.

as allowing "warrantless, suspicionless, nighttime searches of Mr. Jurgens' home to occur for the next 20 years." While the possibility that a probation officer may knock on Jurgens' door at 3:00 a.m. seeking to verify that the filtering software is functional is troubling, *cf. Thompson*, 777 F.3d at 380, this condition is narrower than the home-visit condition discussed earlier.[12] Indeed, if Jurgens' personal computer is a laptop computer, presumably he may comply with this condition by bringing the computer to the probation officer at Jurgens' door or elsewhere, and the officer would not need to enter Jurgens' residence. We find that this condition does not violate Jurgens' Fourth Amendment rights.

This issue highlights the dissonance between defense counsel's and government counsel's respective views of probation officers. Defense counsel appears to view the typical probation officer as Inspector Javert,[13] obsessively en-

---

[12] Likewise, this condition is significantly narrower than the condition at issue in the primary case relied upon by Jurgens in his reply, *United States v. Malenya*, 736 F.3d 554 (D.C. Cir. 2013). In *Malenya*, the court vacated a condition which provided that the defendant "shall not possess or use a computer or have access to any on-line service without the prior approval of the United States Probation Office ... and [shall] allow installation of a computer and Internet-monitoring program." *Id*. at 560. The court vacated this condition because "the record contains no evidence … that Malenya indulged in adult or child pornography" and "[a] ban on computer and internet usage, qualified only by the possibility of probation office approval, is obviously a significant deprivation of liberty." *Id*. at 560–61. Not only is the computer monitoring condition in this case significantly less restrictive than the condition at issue in *Malenya*, but the monitoring condition in this case is closely tailored to Jurgens' offense, unlike in *Malenya*.

[13] *See* Victor Hugo, *Les Misérables* (1862).

gaged in a misguided and destructive pursuit of defendants. Government counsel appears to view the typical probation officer as Mr. Chips,[14] a kindly educator (or rehabilitator) who disciplines only when absolutely necessary. This dissonance finds its root in a probation officer's dual function: "to guide the [defendant] into constructive development" and to prevent "behavior that is deemed dangerous to the restoration of the individual into normal society." *Morrissey v. Brewer*, 408 U.S. 471, 478 (1972). While the balance a particular probation officer strikes between supervision and enforcement may vary, we think it remains true that the ongoing supervisory relationship of a probation officer to a defendant "is not, or at least not entirely, adversarial." *Griffin v. Wisconsin*, 483 U.S. 868, 879 (1987). It is inherent in this system that conditions allow probation officers a degree of discretion in performing their difficult job. Of course, we cannot allow conditions to be worded in such a way as to endow probation officers with "essentially unlimited discretion." *Thompson*, 777 F.3d at 382. But at some point, we must "fairly presume [the defendant]'s probation officer will apply the conditions in a reasonable manner." *United States v. Smith*, 606 F.3d 1270, 1283 (10th Cir. 2010). And if a particular probation officer exercises his or her discretion in an unreasonable manner, this exercise will be subject to review by the district court.

Finally, Jurgens argues that the provision in each treatment/monitoring condition requiring him to pay "if financially able" should "have stated that Mr. Jurgens' inability to

---

[14] *See* James Hilton, *Goodbye Mr. Chips* (1934).

pay could not be a basis for revocation." We think it is apparent from each condition that Jurgens' supervised release may not be revoked for not paying the costs of treatment or monitoring if he is not financially able to pay. *Cf. Baker*, 755 F.3d at 529 ("A defendant may not be recommitted to prison 'for mere inability to pay'…." (quoting *Siegel*, 753 F.3d at 714)). Indeed, we recently referred to the use of the phrase, "if financially able," as a "best practice for district courts to follow" in crafting conditions of supervised release. *Cary*, 775 F.3d at 928–29.

At Kappes' sentencing, the judge imposed special conditions requiring Kappes to participate in sex-offender treatment and probation's Computer and Internet Monitoring Program, and requiring him to pay for the treatment and filtering software "if financially able." Kappes challenges the pay-if-able language in the treatment condition, contending that there is no statutory authority for a court to require a defendant to pay for treatment programs.[15] Kappes overlooks 18 U.S.C. § 3672, which authorizes a court to order repayment by the recipient of treatment "services, training, or guidance," and 18 U.S.C. § 3583(d), which authorizes a court to impose "any other condition it considers appropriate." *See Cary*, 775 F.3d at 928 (holding that a district court is empowered to impose payment conditions pursuant to § 3672 and § 3585(d)). To the extent the sentencing judge failed to make adequate findings to support the payment portion of the

---

[15] Kappes also challenges the pay-if-able language in special condition one, which prohibits him from excessive use of alcohol and use of mood-altering substances and requires him to undergo substance-abuse treatment. We have already vacated this condition.

challenged condition, we find this error to be harmless. It is self-evident that the pay-if-able language will incentivize defendants to succeed with their rehabilitative efforts, *see United States v. Williams*, 739 F.3d 1064, 1066–67 (7th Cir. 2014), and "reimburse [the Administrative Office of the U.S. Courts for] the appropriations obligated and disbursed in payment for such services, training, or guidance." 18 U.S.C. § 3672. Finally, although not challenged by Kappes, we encourage Kappes' sentencing judge on remand to consider modifying the language of the computer-monitoring condition in the same manner as was done by the sentencing judge in Jurgens' case—i.e., in the absence of additional findings on remand, the filtering software should only block websites containing illegal pornography (e.g., child pornography), rather than all "sexually oriented websites." *Cf. Cary*, 775 F.3d at 926–27 (indicating that any internet ban "must be defined to some degree of precision").

### c.  No-Contact Condition

Both Kappes and Jurgens challenge a special condition prohibiting contact with minors. In *Quinn*, we singled out a term of supervised release prohibiting unapproved contact with minors—including the defendant's minor child, whom defendant had never been accused of abusing—and stated that "[p]utting the parent-child relationship under governmental supervision for long periods … requires strong justification." 698 F.3d at 652. After *Quinn*, we have vacated similar no-contact conditions due to a lack of adequate findings. *See Baker*, 755 F.3d at 526–27; *United States v. Poulin*, 745 F.3d 796, 802 (7th Cir. 2014); *Goodwin*, 717 F.3d at 524.

In Kappes' case, the judge adopted *in toto* the condition recommended in the presentence report banning Kappes

from contact with all minors except in the presence of an adult approved by probation, in the course of normal commercial business, or other cases of unintentional and incidental contact. During the sentencing hearing, the judge recited this condition without discussion. Were we to view this portion of the transcript in isolation, the judge's findings would be inadequate to sustain such a condition, despite the fact that—unlike the defendant in *Quinn*—Kappes has no children and has not identified any extended family member with minor children. However, we review the judge's comments at the *entire* sentencing hearing. Prior to listing the conditions, the judge discussed the "much more disturbing information here than just a desire to see young children have sex with adults." The judge said that "a lengthy period of supervised release" is necessary because Kappes, while working as a furniture deliveryman, stole "over 30 female panties, many of which apparently belonged to children," and kept the collection for 20 years. The judge told Kappes that the length of time he kept the collection was "concerning," and "[m]ore disturbing" was Kappes' surreptitious photographing of children playing in a neighboring outdoor pool for approximately ten years. The judge concluded that the conditions of supervised release were necessary because of "worry about any future crimes or possible acting out, stealing panties, pictures of young girls next door." We think the sentencing judge's explanation is sufficient to justify imposing upon Kappes an *appropriately tailored* no-contact condition.

However, the no-contact condition actually imposed upon Kappes is somewhat overbroad. The condition prohibits non-incidental "contact" with males as well as females under 18, despite the fact that we are not aware of any evidence

that Kappes is bisexual. *See Thompson*, 777 F.3d at 376 ("A[n] … error was a condition of supervised release that Thompson not have 'any contact with persons under the age of 18….' This can't have been meant literally, since understood literally it would include males under 18 as well as females, though there is no suggestion that Thompson is bisexual."). Kappes contends that, "[a]lthough he has no children, if he did (or if an extended family member does), his fundamental right to familial association would be violated by a limitation on contact with minors." Given that Kappes was sentenced to a 20-year term of imprisonment at the age of 47, we think that any violation of his rights by this condition is too contingent to be ripe for review at this time. *See Rhodes*, 552 F.3d at 628–29. After Kappes is released from custody, if he or a family member has minor children, he may petition the district court to modify this condition. *See id*. at 629; *see also* 18 U.S.C. § 3583(e)(2).

In Jurgens' case, the presentence report recommended a special condition identical to the one imposed in Kappes' case. Prior to sentencing, the judge ordered a psychosexual evaluation, and the evaluator diagnosed Jurgens with pedophilia and recommended imposition of the same no-contact provision. Jurgens objected that this proposed condition infringed on his constitutional right to familial association because Jurgens has a nephew who is a minor. At sentencing, the judge accommodated this objection by revising the recommended condition to prohibit contact with "non-related" minors except in the presence of an adult approved by probation, in the course of normal commercial business, or other cases of unintentional and incidental contact. The judge said that the no-contact condition was "especially necessary in [Jurgens'] case because the target age of most of your child

pornography was … seven- to eight-year-olds and, further … [Jurgens] made a statement that he 'can't do anything [to minors] when they are not here.'" The judge said that Jurgens' statement was "troublesome enough, given the nature of this offense, that I think it's an appropriate condition to impose in this case." Although this is perhaps the minimum of what might be sufficient to justify a no-contact provision in a possession-only child-pornography case, we think the judge's explanation is sufficient.

Despite the judge's modification of the condition in response to Jurgens' objection, the no-contact provision actually imposed in Jurgens' case is overbroad. The condition prohibits non-incidental "contact" with males as well as females under 18, despite the lack of evidence that Jurgens is bisexual. *See Thompson*, 777 F.3d at 376. Likewise, the judge's statements at sentencing suggest that Jurgens is attracted to seven- and eight-year-olds, making a restriction on contact with 17-year-olds seem unsupported by the judge's findings. Because this case must be remanded for other reasons, the sentencing judge should address the overbreadth of this condition on remand.

#### d. Search Condition

The final special condition imposed upon Jurgens requires him to "submit to the search of [his] person, automobile, and property under [his] control" when "there is reasonable suspicion to believe that [he is] in violation of a condition of supervised release," subjects his computers and related devices to "periodic unannounced examinations," and allows "retrieval and copying of all data ... to ensure compliance with this condition, and/or removal of such equipment for the purpose of conducting a more thorough examina-

tion."[16] Jurgens concedes that because he failed to object to this condition—which was proposed in the presentence report—it now is subject to plain error review. Jurgens nonetheless contends that the condition must be vacated because the sentencing judge failed to support it with adequate findings, the condition infringes on his Fourth Amendment right to keep his property free from unreasonable searches and seizures, and the condition is an excessive deprivation of his Fifth Amendment right to property.

The sentencing judge stated that this condition was being imposed "to ensure compliance with these conditions." Combined with the judge's other comments at sentencing which we have summarized above, we think this is sufficient to support this condition. And even if the judge did not say enough, this would not be the type of error which affects Jurgens' substantial rights, *see Olano*, 507 U.S. at 735, because the consistency of this condition with the sentencing factors and the other conditions "is plain, given the nature of [the

---

[16] The condition states in full:

> If there is reasonable suspicion to believe that you are in violation of a condition of supervised release, you shall submit to the search of your person, automobile, and property under your control by the U.S. Probation Office. You shall also allow the U.S. Probation Office to conduct periodic unannounced examinations of your computer equipment, Internet capable devices, similar electronic devices, related computer peripherals, which may include retrieval and copying of all data from your device to ensure compliance with this condition, and/or removal of such equipment for the purpose of conducting a more thorough inspection.

defendant's] crime," *see Siegel*, 753 F.3d at 713. This condition clearly relates to the goals of rehabilitation, deterrence and protection of the public, and is reasonably related to the nature and circumstances of Jurgens' computer-facilitated offense. *Compare Goodwin*, 717 F.3d at 523 (vacating a similar condition because there was no "indication in the record that Goodwin has ever used a computer to commit any crime").

We next turn to Jurgens' challenge to the merits of the condition, which authorizes searches when "there is reasonable suspicion to believe that [Jurgens is] in violation of a condition of supervised release." Jurgens highlights the standard condition requiring him to follow his probation officer's instructions, and says when that standard condition is combined with the search condition, "the mind runneth over when imagining how many ways an unheeded instruction provides a springboard for searching Mr. Jurgens's person, automobile and property." Jurgens posits that, "[i]f he commits a traffic infraction," a Javert-like probation officer may use the infraction to confiscate Jurgens' computer pursuant to this condition, and "[m]aybe the deprivation is just for a day, but maybe that was the day that Mr. Jurgens was supposed to make a presentation for work and cannot do so because materials for the presentation are on the computer the government took." Jurgens points to no case in which anything remotely similar has happened to a defendant on supervised release, despite the fact that this search condition is common. We do not find that Jurgens' hypothetical conjecture is sufficient to establish plain error. *Cf. United States v. Westerfield*, 714 F.3d 480, 489 (7th Cir. 2013) ("This hypothetical conjecture is baseless, and certainly does not establish plain error.").

In the context of probation, the Supreme Court has held that the Fourth Amendment balance of "the degree to which [a search of a probationer's residence] intrudes upon an individual's privacy and, … the degree to which it is needed for the promotion of legitimate governmental interests," requires "no more than reasonable suspicion to conduct a search of th[e] probationer's house." *United States v. Knights*, 534 U.S. 112, 119, 121 (2001) (quotation omitted); *cf. United States v. Montiero*, 270 F.3d 465, 469, 473 (7th Cir. 2001) (upholding, pre-*Knights*, a suspicionless-search supervised-release condition because the condition was necessary to "curb the sort of criminal activity in which a defendant had a history of engaging," but vacating the condition's suspicionless *seizure* authorization as vague and overbroad, and remanding to the district court "to craft more precisely the seizure authority of the special condition"). Post-*Knights*, the First Circuit has upheld a supervised-release condition materially the same as the computer-search-and-removal condition challenged by Jurgens. *See United States v. Stergios*, 659 F.3d 127, 131 n.6, 134 (1st Cir. 2011). The court noted that, "if the district court could not mandate compliance with the rules of the treatment program, the required participation would be ineffectual." *Id.* at 134 (quotation and alteration omitted); *but see United States v. Lifshitz*, 369 F.3d 173, 193 (2d Cir. 2004) (vacating, under *de novo* review, a similar condition on the basis that "[t]he scope of the computer monitoring condition as it stands may … be overbroad," and ordering "the district court to evaluate the privacy implications of the proposed computer monitoring techniques as well as their efficacy as compared with computer filtering").

Given the legal authority cited above, we cannot find that the district court plainly erred in imposing the search condi-

tion upon Jurgens. *See Olano*, 507 U.S. at 734 ("At a minimum, court of appeals cannot correct [a plain] error … unless the error is clear under current law."). We do note that both the defense and the government assume that, as stated in the government's brief, "[t]he removal provision requires Mr. Jurgens to release his computer for more thorough inspection by his probation officer only if there is reasonable suspicion that Mr. Jurgens has violated the terms of his release." However, the language of the condition is not as clear as it could be on this point. On remand, the sentencing judge should consider rewording the condition to clarify that the "periodic unannounced examinations of [Jurgens'] computer equipment … which may include … removal of such equipment for the purpose of conducting a more thorough inspection" may *only* be done if the probation officer has reasonable suspicion to believe that Jurgens is in violation of a condition of supervised release. *See* 18 U.S.C. § 3583(d) (authorizing a supervised-release condition requiring a sex offender to submit to search "by any law enforcement or probation officer *with reasonable suspicion* concerning a violation of a condition of supervised release or unlawful conduct by the person" (emphasis added)); U.S.S.G. § 5D1.3(d)(7)(C) (recommending the same special condition for sex offenders); *cf. Farmer*, 755 F.3d at 854 (vacating a search condition that required "no suspicion, reasonable or otherwise, to trigger a search"). The identical condition was imposed upon Kappes, and we similarly encourage Kappes' sentencing judge to consider rewording the condition.

### V. Pronounce All Conditions

The fourth sentencing principle that we address in the context of imposing conditions of supervised release is the

need to orally pronounce all conditions from the bench. "[W]hen there is a conflict between an oral and later written sentence, the oral judgment pronounced from the bench controls." *United States v. Johnson*, 765 F.3d 702, 710–11 (7th Cir. 2014). However, if "[t]he specifications in the written judgment clarify the oral pronouncement" and the written provisions "are not inconsistent with an unambiguous [oral] provision," then the differing written provisions will not be vacated. *Baker*, 755 F.3d at 529 n.2. The parameters of this rule can be seen by comparing examples of how we have applied it. *Compare Johnson*, 765 F.3d at 711 ("[T]he district court unambiguously announced several specific conditions of supervised release at Johnson's sentencing hearing and did not include any statement as to whether other standard conditions would apply…. [A]ny new conditions imposed in the later written judgment are inconsistent with the court's oral order and must be vacated."), *and United States v. Alburay*, 415 F.3d 782, 788 (7th Cir. 2005) ("The written version contradicts the oral version in that the oral version does not order 'immediate deportation' in any shape or form."), *with Baker*, 755 F.3d at 529 n.2 ("Any argument that the payment conditions should be vacated because the written judgment, explicitly stating the entity or official who can direct Baker to pay, is inconsistent with the oral pronouncement, which only says 'as directed' without specifying by whom, is unavailing."), *and United States v. Bonanno*, 146 F.3d 502, 511–12 (7th Cir. 1998) (holding that when the district court orally imposed "all the standard conditions of supervised release adopted by this Court" but did not enumerate those conditions until the written order, the written order was merely a clarification of the vague oral pronouncement and the enumerated standard conditions would not be vacated). "We

review a claim of an inconsistency between the oral and written judgments *de novo*, comparing the sentencing transcript with the written judgment to determine whether an error occurred as a matter of law." *Johnson*, 765 F.3d at 710.

Kappes contends that the sentencing judge violated this rule three times, and requests that the allegedly inconsistent provisions in the written judgment be vacated. First, during the sentencing hearing, the judge orally stated that Kappes will have to submit to "*psychological* testing, including polygraph testing, which may be part of a sex offender treatment program." The written judgment states that Kappes will have to submit to "*physiological* testing, including polygraph testing, which may be part of a sex offender treatment program." Given that, strictly speaking, polygraph testing is a physiological, rather than psychological, test, there was an ambiguity in the judge's oral sentence. Accordingly, we may look to the written judgment to help determine the intended sentence. *See Bonanno*, 146 F.3d at 511. After looking to the written judgment, it is clear that the sentencing judge simply misspoke when he said "psychological testing," and intended the condition to impose "physiological testing," as stated in the judgment (as well as in the unobjected-to presentence report). Accordingly, this provision is not vacated for violating the rule that conditions must be orally pronounced.

Next, the sentencing judge orally required Kappes to "allow Probation to conduct periodic, unannounced examination of your computer, Internet capable devices, electronic devices, or related computer peripherals; and they may retrieve or copy all data from your devices to ensure compliance." The written judgment adds the requirement that Kappes allow the "removal of such equipment for the pur-

pose of conducting a more thorough inspection." Here, the oral pronouncement was unambiguous. If "the oral version is unambiguous, there is no need to look beyond the oral version for any clarification from the written version. The written version is thus a nullity, not requiring further discussion." *Alburay*, 415 F.3d at 788 (citation omitted). Therefore, the inconsistent provision in the written judgment, allowing the removal of Kappes' computer equipment, is vacated. However, this may be a hollow victory for Kappes since we are remanding for resentencing on other grounds. If, after hearing from the parties and otherwise complying with the appropriate sentencing procedures, the judge wishes to include the computer-removal provision in special condition number six, he may do so during resentencing.

Kappes' third challenge involves the oral omission of the written judgment's ban on "paraphernalia related to any controlled substance or mood altering substance," which appears in special condition number one. As we have already vacated this special condition for other reasons (due to its ban on "excessive" use of alcohol and possession and use of any "mood altering substance"), we decline to consider this additional challenge to the condition.

## VI. Mitigation Argument

Apart from his challenges to the conditions of supervised release, Crisp contends that the sentencing judge erred by failing to consider or comment upon one of his principal arguments in mitigation, namely, that he cooperated with law enforcement despite the lack of a government motion for a reduced sentence. *See United States v. Leiskunas*, 656 F.3d 732, 737 (7th Cir. 2011) ("A district court may consider a defendant's cooperation with the government as a basis for a re-

duced sentence, even if the government has not made a [U.S.S.G.] § 5K1.1 or [Federal] Rule [of Criminal Procedure] 35 motion.").

We review *de novo* whether a judge followed proper procedures in sentencing, including whether the judge adequately explained his or her chosen sentence. *United States v. Davis*, 764 F.3d 690, 694 (7th Cir. 2014). "A sentencing judge must address a defendant's principal arguments in mitigation when those arguments have recognized legal merit." *Id.*; *see Cunningham*, 429 F.3d at 679.[17] The judge, however, "need

---

[17] "[S]ince 2005 we have decided nearly 200 cases presenting questions under the *Cunningham* duty to explain the reasons for rejecting principal arguments in mitigation." *United States v. Donelli*, 747 F.3d 936, 941 (7th Cir. 2014). In an effort to address this recurring issue, we offered a suggestion to sentencing judges in *United States v. Garcia-Segura*, 717 F.3d 566 (7th Cir.), *cert. denied*, 134 S. Ct. 667 (2013), which we repeat here:

> In order to ensure that defendants feel that they have had such arguments in mitigation addressed by the court and to aid appellate review, after imposing sentence but before advising the defendant of his right to appeal, we encourage sentencing courts to inquire of defense counsel whether they are satisfied that the court has addressed their main arguments in mitigation. If the response is in the affirmative, a later challenge for failure to address a principal mitigation argument under the reasoning of *Cunningham* would be considered waived. If not, the trial court would have the opportunity to clarify whether it determined that the argument was so weak as not to merit discussion, lacked a factual basis, or has rejected the argument and provide a reason why. An affirmative answer, however, would not waive an argument as to the merits or reasonableness of the court's treatment of the issue.

not address arguments that have no apparent merit, and need not spend time addressing an argument if 'anyone acquainted with the facts would have known without being told why the judge had not accepted the argument.'" *United States v. Castaldi*, 743 F.3d 589, 595 (7th Cir. 2014) (quoting *Cunningham*, 429 F.3d at 679). "The explanation need not be exhaustive, but it must be sufficient to satisfy this court that the sentencing judge has given meaningful consideration to the section 3553(a) factors and the parties' arguments in determining how long the defendant's sentence should be. This will entail some discussion of any significant argument the defendant has made with respect to his characteristics that might bear on the length of the sentence." *United States v. Schmitz*, 717 F.3d 536, 541 (7th Cir. 2013) (citations omitted). "The amount of explanation needed in any particular case depends on the circumstances, and less explanation is typically needed when a district court sentences within an advisory guidelines range." *United States v. Curby*, 595 F.3d 794, 797 (7th Cir. 2010) (quotation and citations omitted).

At sentencing, defense counsel said there was no motion to deviate from career offender status because "there was a cooperation agreement that was signed," and "a proffer was conducted," and "there may have been a 5K1.1 motion if Mr. Crisp had entered into a cooperation plea agreement, which he elected not to do, to preserve his rights to appeal and the other things that would have been waived under the cooperation plea agreement." The judge responded: "So what you're saying to me is: There may have been an attempt at

---

*Id*. at 569 (quotation and citation omitted).

cooperation, or he may actually have taken the first step towards it. But, in the end, no cooperation agreement was signed and incorporated into a plea agreement [and] we ended up with an open plea?" Defense counsel said the judge was "correct" and explained, "I would say that we went all the way through the entire procedure up to the point where he would have entered into a cooperation plea agreement, a written agreement, which was not actually performed." The judge then outlined the facts of the case and commented: "So while there isn't a cooperation agreement here, there certainly is an exceptional early acceptance of responsibility by his being *Mirandized*, waiving his constitutional rights, telling [agents], 'Yes, you got me, and this is what I've been doing.' So no obstruction of justice, resisting arrest, a cooperation in the execution of the search warrant, and admissions took place immediately."

Later in the hearing, defense counsel made several mitigating arguments, including Crisp's family history, his drug addiction, his status as a "a neighborhood level dealer" rather than a "drug kingpin," the lack of weapons in his criminal history, his effort to support his daughter, his conduct compared to that of most career offenders, and his sentencing range had he not been a career offender. Defense counsel then argued: "[H]e cooperated right away. The second he was arrested he said, 'You got me. I admit it. I waive my *Miranda*. I confess.' He was pled out within three months after the indictment came down. And … between the indictment and the actual change of plea, he did cooperate. I sat in the Ford County Jail basement for three and a half hours with agents while he regaled them with all the information he could possibly give them." Defense counsel said that, although the Government did not make a substantial assistance

motion pursuant to U.S.S.G. § 5K1.1, "the Court can still consider the timeliness of the cooperation, the fact that he did render a proffer that was lengthy, that even though the government doesn't have to mention it because he didn't comply with the rest of that cooperation agreement by entering into that binding plea, he still tried his best; and he did accept responsibility in a very, very quick manner."

The judge then discussed Crisp's lengthy criminal history (35 arrests and 23 convictions, including four drug felonies), and said that a sentence of the mandatory minimum of 10 years (as suggested by defense counsel) "would depreciate the seriousness of his history of crime." The judge said that he would sentence Crisp below the guidelines imprisonment range (262 to 327 months), because the judge would "take into consideration the fact that maybe he has rehabilitative potential by his allocution today; and by the time he was arrested, he gave it up quickly. He admitted it. So I think the exceptional acceptance of responsibility here immediately shows that there is an opportunity of hope for rehabilitation…. So how far do I depart from the career offender guidelines? I will depart 22 months to 240 months."

Given the judge's below-guidelines sentence, and "[p]aying close attention to the context and practical realities," *Castaldi*, 743 F.3d at 595–96, we find that the judge did not err by failing to mention Crisp's proffer to law enforcement agents when the judge was discussing the § 3553(a) factors. During sentencing, each time defense counsel raised the subject of cooperation, counsel mentioned it in conjunction with Crisp's quick acceptance of responsibility. The district court explicitly considered and credited Crisp's "exceptional acceptance of responsibility." Although the judge did

not go on to discuss Crisp's proffer specifically, the judge considered the mitigation argument in the same context as it was argued by counsel—acceptance of responsibility. And the judge's earlier discussion with counsel shows that the judge recognized the proffer and understood it to be "the first step" toward a cooperation plea agreement. In this circumstance, we are satisfied that the judge, "even if implicitly and imprecisely," considered Crisp's principal arguments in mitigation. *United States v. Spiller*, 732 F.3d 767, 769 (7th Cir. 2013) ("[A]s long as the sentencing court considers the arguments made in mitigation, even if implicitly and imprecisely, the sentence imposed will be found reasonable." (quotation omitted)); *see also United States v. Poetz*, 582 F.3d 835, 839 (7th Cir. 2009) ("[I]t is apparent from this record that the judge fully understood [the defendant's] argument on this point and implicitly considered ... it in imposing a lenient, below-guidelines term of imprisonment.").

Moreover, defense counsel did not give the judge any meaningful specifics about Crisp's proffer—such as whether Crisp identified suppliers, customers, the location of contraband, or any other specifics about his drug deals. Even defense counsel refrained from describing the single session with law enforcement agents as "substantial assistance," and she never indicated that Crisp's "regaling" the agents with information prompted, advanced, or assisted any investigation or prosecution. Given our conclusion that the judge adequately considered Crisp's arguments, we need not determine whether this argument was "so weak as not to merit discussion." *Cunningham*, 429 F.3d at 679. It is enough to say that a weaker argument, lacking specific factual support, does not merit as much discussion as a stronger one. *See Davis*, 764 F.3d at 694 ("[T]he amount of explanation required

from the district court varies with the circumstances. A brief explanation can certainly suffice." (quotation and citation omitted)).

## VII. Relief

Our final order of business is deciding upon the relief to issue in each case. In prior cases in which we found error in the supervised release portion of the sentence, but no error in the custodial portion, we have sometimes remanded for resentencing of the supervised release issue only, and sometimes simply remanded "for resentencing consistent with this opinion."[18] Recently, we remanded for an entire resen-

---

[18] *Compare Siegel*, 753 F.3d at 717 ("So the prison sentences in both our cases stand, but the cases must be remanded for reconsideration of the conditions of supervised release that we have determined to be inappropriate, inadequately defined, or imposed without the sentencing judge's having justified them by reference to the sentencing factors in 18 U.S.C. § 3553(a)."), *and Goodwin*, 717 F.3d at 526 ("[W]e affirm Goodwin's conviction, vacate the supervised release portion of his sentence, and remand to the district court for resentencing consistent with this opinion. The resentencing shall be limited to a reassessment of the length of Goodwin's supervised release and any special conditions imposed during this period."), *and Quinn*, 698 F.3d at 653 ("The term of supervised release is vacated, and the case is remanded for resentencing on that issue only."), *with United States v. Sewell*, --- F.3d ----, No. 14-1384, 2015 WL 1087750, at *12 (7th Cir. Mar. 13, 2015) ("We vacate … each of Sewell's conditions of supervised release. We vacate each condition because reconsideration of some conditions may impact the imposition of others. The sentence is affirmed in every other respect. The case is remanded to the district court for proceedings consistent with this opinion."), *and Baker*, 755 F.3d at 529 ("We vacate Baker's supervised release term, special conditions 1 and 4, and the payment provision in conditions 1, 3, and 8; and remand for resentencing consistent with this opinion. We affirm Baker's prison term and all of the other terms in the special conditions

tencing "because reconsideration of those [vacated] conditions may conceivably induce one or more of the judges to alter the prison sentence that he imposed." *Thompson*, 777 F.3d at 382.

We hesitate to require a complete resentencing in the cases before us, especially in Crisp's case, as only a small number of his conditions have been affected by this opinion. But because the custodial and supervised release portions of a sentence serve somewhat, though not entirely, overlapping purposes, there might properly be an interplay between prison time and the term and conditions of supervised release.[19] *See Albertson*, 645 F.3d at 198. If certain supervised release conditions are vacated, the balance struck by the sentencing judge might be disrupted to a degree where the judge would wish to alter the prison term and/or other conditions to ensure that the purposes of deterrence, rehabilitation, and protecting the public are appropriately furthered by the overall sentence. Accordingly, as we did in *Thompson*, we vacate the entire sentences and remand for a complete resentencing.

After this long march through these defendants' challenges and our recent supervised-release jurisprudence, a sentencing judge might be frustrated with the task of navi-

---

imposed."), *and Shannon*, 743 F.3d at 503 ("We vacate Special Condition No. 10 of Shannon's supervised release and remand for further proceedings consistent with this opinion.").

[19] While an interplay may be proper, the prison term and supervised release term should not be treated as interchangeable. *See Johnson*, 529 U.S. at 60.

gating the maze of rules and principles that we—interpreting the strictures of Congress—have outlined. A sentencing judge might be tempted to conclude that the imposition of discretionary conditions of supervised release is more trouble than it is worth. And perhaps in certain cases, only a small number of well-tailored discretionary conditions may be all that is necessary to accomplish the purposes of supervised release. A comparatively small number of conditions might also make compliance easier on defendants and supervision easier on understaffed probation departments. But no matter the number of conditions, so long as they are appropriately tailored, adequately justified, and orally pronounced after proper notice, they will be upheld. Whether the system of supervised release is worth its human and financial costs is a matter beyond our mandate and competence. We trust that the supervised-release system represents a worthwhile method of rehabilitating defendants, deterring future crimes and protecting the public.

In all three cases, the judgments are REVERSED, and the cases are REMANDED for resentencing.