In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1492

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KRISTOPHER WARREN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 15-cr-56-wmc — **William M. Conley**, *Chief Judge.*

ARGUED SEPTEMBER 28, 2016 — DECIDED DECEMBER 5, 2016

Before POSNER, FLAUM, and MANION, *Circuit Judges.*

FLAUM, *Circuit Judge.* Kristopher Warren pled guilty to transporting and possessing child pornography and was sentenced to five years' imprisonment and fifteen years' supervised release. The district court entered an order modifying Warren's conditions of release pursuant to 18 U.S.C. § 3583(e). Warren challenged three of the conditions, and the district court dismissed his objections. We affirm.

## I. Background

Between September 18, 2003, and October 7, 2003, Warren moderated a Yahoo! Group originally named "FunFotos4all." Warren founded this group, established its rules, and frequently changed the group's name to evade enforcement of Yahoo! Group rules. During this time period, Warren posted to the group 117 images of child pornography, including images titled "9yococksuck[1].jpg," "12yoBondage.jpg," and "14yo girl-bound and gagged.jpg"; images of prepubescent and minor girls exposing their genital areas and being vaginally or orally penetrated by adult male penises; and at least one image of a prepubescent girl being anally penetrated by a minor boy. After images were posted to the group, Warren sorted them into albums with titles such as "ForcedorTieduporCrying," "hots Toys-R-US," and "virgin." He also posted notices and comments to the group, including requests for "new" images of child pornography that had not been previously viewed on the Internet. The following are examples of Warren's comments:

- On September 19, 2003: "I have changed the name, and made this a restricted group in hopes that it stays open longer. Members are now required to send 2 pictures to obtain and keep membership."

- On September 23, 2003: "I added a ton of pics and regrouped them all so they're easier to find. Please add a photo or two to the 'Add new pict here' folder and I will sort them. I think the group looks pretty good right now but we could use some more pics. I'm rejected [*sic*] any new members who haven't added pics and I'll go through the members who are dead beats later in the week. Post away!!!!"

- On September 24, 2003: "Anyone interested in young braless candid, or web cam hardcore? Please post and I'll start a folder."

- On September 28, 2003: "Added a ton, but need some more help on pics – the photo albums are looking good but we're a little light in some areas. CANDID: Nips showing through shirts, swimsuits, or bras, or any personal ones, or stuff that hasn't made the rounds and is of the right age, lets [*sic*] add them to our collection. FORCEDORTIEDORCRYING: Anyone have some good young stuff. We don't have many crying pics yet. Any pics you want to add to the ADDNEWPICS folder would be appreciated. GOOD WORK EVERYONE, Your moderator."

- On September 28, 2003: "I forgot one photo album that is really weak, VIRGINS. People have been sending me a lot of requests so please send in your pics. Anything with unbroken hymens, or popping a cherry for the first time is good. Nothing will be rejected."

- On September 30, 2003: "Real High school girls age 14-17. No pictures that have made their way around the internet. The pics must be very sexy and will be deleted if they are not. Send a few to join."

In February 2004, agents executed a search warrant at Warren's residence and seized his computer. A partial review of the images on Warren's computer revealed 263 images and one video of child pornography, 135 images of child erotica, 297 images of subjects of an undetermined age engaging in sexually explicit conduct, and 949 images of adult pornography. During his interview with the FBI, Warren admitted that

he was part of the forum and that the child pornography on the computer belonged to him.

From the time of his confession until 2009, Warren attended therapy, moved back to his hometown in Wisconsin, and avoided further legal trouble. In March 2009, Warren was charged with transportation of child pornography, in violation of 18 U.S.C. § 2252(a)(2), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), in the Central District of California. Warren pled guilty in July 2009.[1]

In February 2010, Warren was sentenced to five years' imprisonment and fifteen years' supervised release.[2] Prior to

---

[1] In his plea agreement, Warren agreed to particular conditions of supervised release if "imposed by the court." The conditions included that Warren would: (1) "participate in a psychological counseling and/or psychiatric treatment and/or sex offender treatment program, which may include inpatient treatment, as approved and directed by the Probation Officer. *The defendant shall abide by all rules, requirements, and conditions of such program, including submission to risk assessment evaluations and physiological testing, such as polygraph and Abel testing;*" and (2) "shall not associate or have verbal, written, telephonic, or electronic communication with any person under the age of 18, except: (a) in the presence of the parent or legal guardian of said minor; and (b) on the condition that the defendant notify said parent or legal guardian of his/her conviction in the instant offense/prior offense. This provision does not encompass persons under 18, such as waiters, cashiers, ticket vendors, etc. with whom the defendant must deal in order to obtain ordinary and usual commercial services." (emphasis added). The emphasized language from the first condition, however, was omitted from the special condition in the actual Judgment of Conviction, and the record does not explain this omission.

[2] His conditions of supervised release included conditions that he comply with the rules and regulations of the U.S. Probation Office and General Order 318, which contains a condition stating that "the defendant

sentencing, the government alleged that Warren's computer had also revealed his perusal of websites about drugging people, and photos of adult women, including his then-girlfriend, sleeping or otherwise unconscious and in various states of undress. Warren denied ever drugging or assaulting anyone, his then-girlfriend stated that the photos of her sleeping had been taken consensually, and Warren was never charged with any crime related to the pictures. The sentencing judge did not address the matter.

During his five-year prison term, Warren tutored inmates, started a Sex Addicts Anonymous group, and became involved in "Life Connections," a Christian residential-reentry preparation program. Warren also requested relocation of his supervision to the Western District of Wisconsin. His request was later approved, and at the end of his prison term, Warren returned to Wisconsin. The Madison, Wisconsin probation office petitioned the court to modify Warren's conditions of supervised release to match the office's standard language and to add conditions that the office generally requests in "sex offender" cases. These conditions included, in relevant part, (1) a travel condition, (2) a no-contact-with-minors condition, and (3) a polygraph condition. The judge appointed counsel for Warren, and on June 22, 2015, Warren filed a brief objecting to the proposed changes. During the hearing and mediation process leading up to the district court's final decision, the parties stipulated with respect to the polygraph condition that Warren's treatment provider had not requested polygraph testing; rather, the probation office would secure a pol-

---

shall not leave the judicial district without the written permission of the court or probation officer."

ygraph examiner, in part for use in monitoring Warren's compliance with supervision, and if probation thought the information provided during a polygraph exam might be relevant to treatment, they would pass that information along.

On February 23, 2016, after briefing by the parties and a hearing, the court issued an opinion and order on the defendant's conditions of supervised release, which included the following conditions:

> Standard Condition No. 1: Defendant shall not leave the judicial district in which defendant is being supervised without the permission of the court or probation officer.
>
> Special Condition No. 4: Not associate with any person under the age of 18 or have verbal, written, telephonic, or electronic communication with any such person, except with the express permission of the minor's parent or legal guardian and the supervising U.S. probation officer. This provision does not include persons under the age of 18, such as waiters, cashiers, ticket vendors, etc., with whom defendant must deal in order to obtain ordinary and usual commercial services.
>
> Special Condition No. 7: Undergo a psychosexual evaluation, which may involve use of polygraph examinations, as approved by the supervising U.S. probation officer. Defendant shall participate in an outpatient sex offender counseling program if recommended by the evalua-

tor, which may involve the continued use of polygraph examinations, as approved by the supervising U.S. probation officer. Defendant's answers to questions by the treatment provider, probation officer and polygraph examiner shall be truthful in all respects unless a fully truthful statement would tend to incriminate defendant, in violation of defendant's constitutional rights, in which case defendant has the right to remain silent. Defendant shall follow all restrictions and treatment requirements of the program.

Warren challenges these three conditions on appeal.

## II. Discussion

With respect to claims of substantive error, we review contested conditions of supervised release for abuse of discretion. *United States v. Kappes*, 782 F.3d 828, 844 (7th Cir. 2015); *United States v. Poulin*, 809 F.3d 924, 930 (7th Cir. 2016), *reh'g denied* (Feb. 22, 2016). We review claims of procedural error de novo. *Poulin*, 809 F.3d at 930. Throughout, "we must be mindful of the fact that '[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case,' and 'district courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.'" *Kappes*, 782 F.3d at 844 (quoting *Gall v. United States*, 552 U.S. 38, 51–52 (2007) (alteration in original).

The Sentencing Reform Act of 1984 imposes a handful of mandatory conditions and allows for additional discretionary

conditions. 18 U.S.C. § 3583; *United States v. Siegel*, 753 F.3d 705, 707 (7th Cir. 2014). Certain discretionary conditions are designated as "standard," U.S.S.G. § 5D1.3(c), while others are called "special," *id.* §§ 5D1.3(d)-(e), and are recommended for particular offenses. *Siegel*, 753 F.3d at 707. Regardless, "all discretionary conditions of supervised release must … comply with overall federal sentencing policy as stated in 18 U.S.C. § 3553(a)." *Id.* These policy considerations include "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed," and "the kinds of sentences available." *United States v. Thompson*, 777 F.3d 368, 373 (7th Cir. 2015) (citing 18 U.S.C. § 3553(a)). Ultimately, a sentencing judge should consider four general principles when imposing conditions of supervised release:

> (1) [T]he importance of advance notice of conditions being considered; (2) the need to justify the conditions and the length of the term at sentencing by an adequate statement of reasons, reasonably related to the applicable § 3553(a) factors; (3) the goal of imposing only specific, appropriately-tailored conditions—which is to say, avoiding the imposition of vague or overbroad conditions; and (4) the requirement to orally pronounce all conditions, with the written judgment only clarifying the oral pronouncement in a manner that is not inconsistent with an unambiguous oral provision.

*Kappes*, 782 F.3d at 838–39. In essence, the imposed conditions "cannot involve a greater deprivation of liberty than is rea-

sonably necessary to achieve the goals of deterrence, incapacitation, and rehabilitation." *United States v. Goodwin*, 717 F.3d 511, 522 (7th Cir.) (citing *United States v. Holm*, 326 F.3d 872, 876 (7th Cir. 2003)), *cert. denied*, — U.S. —, 134 S. Ct. 334 (2013).

### A. Standard Condition No. 1: Travel Condition

Warren contends that the district court both procedurally and substantively erred in imposing the travel condition without adequate justification relating to his background, crime, protecting the public, or any other goals of sentencing. This condition, however, is an administrative requirement that can be imposed without explanation. *See Thompson*, 777 F.3d at 378; *see also Poulin*, 809 F.3d at 931; *Kappes*, 782 F.3d at 848 (requiring *non*-administrative conditions to be adequately supported and not vague or overbroad). Warren counters that, because he objected to the travel condition before the district court, this case is distinguishable from *Kappes* and *Thompson*. However, we never tied our holdings in those cases to the fact that defendants did not initially challenge the travel condition.

Moreover, though it was not required to do so, the district court articulated several sound reasons for the travel condition, including that "it is related to tracking and controlling defendant, given the nature of his offenses of conviction for child sex offenses"; "[he] is a relatively wealthy businessman, capable of traveling out of the judicial district without notice"; it "serves as a general and specific deterrent"; "it serves to protect the public"; and it allows probation officers to "more easily accomplish[]" their "statutory duty to keep informed of a defendant's location, conduct, condition and compliance … within a district in which the officer is familiar *and* has unquestioned jurisdiction." *United States v. Warren*, No. 15-cr-56-

wmc, 2016 WL 738779, at *7 (W.D. Wis. Feb. 23, 2016). Warren argues that his offense did not include a travel-related component; however, the fact that Warren committed his offense from inside his home does not neutralize the potential threat he poses to children *outside* his home. *See Poulin*, 809 F.3d at 927, 931–32 (concluding that a travel condition was justified where defendant stored and viewed child pornography in his basement); *Kappes*, 782 F.3d at 839, 849–50 (upholding travel condition imposed on defendant who distributed and possessed child pornography using a computer in his apartment).

Warren also argues that the travel condition is vague because it is unclear what might be a basis for probation's approval or disapproval of any particular travel plans. But, as we observed in *Kappes*, "[i]t is inherent in this system that conditions allow probation officers a degree of discretion in performing their difficult job…. [A]t some point, we must 'fairly presume [the defendant]'s probation officer will apply the conditions in a reasonable manner.'" 782 F.3d at 857–58 (last alteration in original) (citation omitted). This is certainly the case with administrative conditions, such as this one, which we have characterized as "necessary incidents of supervision." *Id*. at 843.

### B. Standard Condition No. 4: No-Contact-With-Minors Condition

Warren next argues that the district court procedurally and substantively erred in imposing the no-contact-with-minors condition.

Procedurally, he claims the court erred when it mistakenly referenced in its order imposing the no-contact condition a "previous violation while on supervised release." Warren has

not committed any such previous violation. This error is harmless, however, as the other factors the court relied on to justify the condition are sufficient to support its imposition. These include defendant's efforts to solicit new, specific kinds of child pornography; the risk that he would promote the creation of new child pornography; his perusal of websites providing instructions on how to drug women; and his images of apparently asleep or unconscious women with exposed breasts and genitals. *Warren*, 2016 WL 738779, at *10. Further, the district court did not mention any previous supervised-release violation in its opinion. *See id*. Thus, it is apparent this factor played little to no role in the court's imposition of this condition, and the error is harmless.

Substantively, Warren contends the no-contact provision is inappropriate because it is not justified by the facts of his case. Warren compares the case at hand to three cases where we considered similar no-contact provisions and concluded they were overbroad: *Thompson* (where the defendant had an online relationship with a teenage girl involving the exchange of nude pictures, and later sexual intercourse), *Kappes* (where the defendant downloaded child pornography, had been taking photos of an underage girl at a nearby pool for the past ten years, and had stolen and kept children's underwear for twenty years), and Jurgens[3] (where the defendant possessed child pornography of seven- and eight-year-olds, had been diagnosed with pedophilia, and had stated that he "can't do anything [to children] when they are not here"). Warren further emphasizes that we characterized Jurgens's offense as "perhaps the minimum of what might be sufficient to justify a no-

---

[3] This defendant's appeal was consolidated and considered in *Kappes*, 782 F.3d at 839.

contact provision in a possession-only child-pornography case," *Kappes*, 782 F.3d at 860. Warren argues that his own offense is less serious than all of these cases because he did not commit a "hands-on" offense with a minor, his criminal conduct lasted for only nineteen days, and it occurred over twelve years ago.

Our case law clearly establishes that commission of a "hands-on" offense is not necessary to impose a no-contact condition. *See, e.g.*, *Kappes*, 782 F.3d at 859; *Poulin*, 809 F.3d at 935 (holding that the district court did not abuse its discretion in imposing a no-contact condition on a possession-only child-pornography offender where the court considered the condition's impact on the defendant's familial relations, the lack of a pedophilia diagnosis, and the lack of evidence that he had acted out sexually toward a child). Where a possession-based offense is sufficiently serious, a tailored no-contact provision may be imposed. *See, e.g.*, *Kappes*, 782 F.3d at 859.

On appeal, Warren downplays his criminal conduct. He argues that "most of [his forum] was lawful pornography," that "there's no evidence that Warren ever had a specific interest in children (as opposed to pornography generally)," and that his activity was "far removed from real children." As the government notes, however, "there is no indication in the PSR [Pre-Sentence Report] (or any other document) that the Yahoo! Group that the defendant created and managed contained any adult pornography." More importantly, possession of adult pornography does not serve as the basis for his conviction and sentence. Rather, Warren's conviction centered on the child pornography he admits he posted and encouraged others to post in the forum. The file names, the content of the

images he posted, and the comments he made all evince a specific interest in children. He also actively and specifically solicited new child pornography, creating a risk that real children would be further victimized. *See United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) ("Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced."). As such, the district court did not err in implicitly finding Warren's child-specific interests and actions were at least as serious as the "minimum" identified in *Kappes*, warranting the no-contact condition.

Warren next takes issue with the district court's statement that it was not "willing to discount the possibility that the defendant's past perusal of 'instructional' websites about drugging women, coupled with images found on the defendant's camera of apparently asleep or unconscious women with breasts and genitals exposed, suggests related risks." *Warren*, 2016 WL 738779, at *10. He argues that no court has ever made findings of fact with respect to these allegations, and that they are unrelated to the no-contact condition, which focuses on minors. Warren does not, however, dispute the fact that he perused these websites and possessed these images. Moreover, the district court, within its discretion, referred to the suggested risks raised by these facts only as they relate to minors. *See Kappes*, 782 F.3d at 844. Indeed, although these particular images were not of children, Warren's apparent sexual interest in incapacitated and vulnerable women, considered together with his specific solicitations of new child pornography, raise reasonable concerns regarding his contact with minors. Finally, even without consideration of these facts, the

district court's other justifications for imposing the no-contact condition, as described in more detail above, are sufficient. *See Warren*, 2016 WL 738779, at *10.

Finally, Warren argues that the no-contact condition is overbroad, as it could effectively bar him from participating in any number of everyday activities (such as attending church, sporting events, barbecues, or block parties) in which minors, too, are often included. We uphold these types of conditions, however, when the district court reasonably concludes that the facts of the case justify them. *See Poulin*, 809 F.3d at 935. Additionally, the no-contact condition here is more narrowly tailored than those Warren points to. In *Thompson*, we vacated a no-contact condition, in part because it did not exempt incidental contact with, for example, waitresses or cashiers who could be minors. *Id*. at 376. The no-contact condition here, however, does just that. Lastly, as the district court noted, imposing such an appropriately tailored condition and allowing the probation office discretion to approve or disapprove Warren's attendance at various events or locations where minors may be present is reasonable. *See Kappes*, 782 F.3d at 859. Accordingly, the no-contact condition is not overbroad.

### C. Standard Condition No. 7: Polygraph Condition

Finally, Warren contends the polygraph-testing condition imposes an inappropriate "probation-monitoring-focused polygraph condition." Relying on *Siegel*, Warren stresses that we have previously taken issue with a condition requiring the defendant to submit to polygraph testing, which may be part of a sex offender treatment program as directed by the probation office. 753 F.3d at 713 (alteration in original). There, we questioned, "If physiological testing *may be* rather than must

be part of the required sex-offender treatment program, implying that it is not a mandatory part, why is it a free-standing requirement, imposed whether or not it is part of a sex-offender treatment program? What other function could it serve? Is it just a euphemism for giving the prisoner lie-detector tests?" *Id*. Warren concludes that polygraph tests are appropriate only when they are requested by the treatment provider, and directed by and toward treatment, not monitoring.

The district court, however, relied on *United States v. Brewster*, 627 F. App'x 567 (7th Cir. 2015). There, we held that the district court did not err in imposing a polygraph condition unrelated to treatment, "as a means to insure compliance with program requirements and restrictions," given the defendant's horrific conduct (sexually abusing his two daughters) and his subsequent portrayal of himself to the district court as a "good father." We also noted that his lack of "honest self-assessment" made polygraph testing especially appropriate.

Together, *Siegel* and *Brewster* demonstrate that determining whether a polygraph condition is appropriate (*e.g.*, with respect to the extent to which it ought to be (1) tied to treatment and (2) under the purview of the treatment provider versus the probation office) depends on the facts of each case. Our holdings in *Kappes* and *United States v. Rhodes*, 552 F.3d 624 (7th Cir. 2009), further illustrate this principle. In *Kappes*, we dismissed one defendant's exception to a condition that he "submit to physiological testing, including polygraph testing, which may be part of a sex offender treatment program as directed by the U.S. Probation office"; because "we read this condition as [simply] delegating to probation the selection of the treatment provider." 782 F.3d at 856. We noted that "only the treatment provider is authorized to select the type(s) and

amount of testing." *Id*. In *Rhodes*, the condition at issue similarly stated that the defendant was to "undergo a psychosexual evaluation and participate in an outpatient sex offender counseling program if recommended by the evaluator which may involve use of polygraph and plethysmograph examinations." 552 F.3d at 626. We observed, however, that "[p]erhaps the counselor and the Probation Officer responsible for this case may determine that [PPG] testing would not be efficient, effective, economical, or necessary, or perhaps they would be satisfied with polygraph testing alone, which is not unusual." *Id*. at 628. In sum, some cases may warrant the probation officer's involvement in polygraph examinations, while others may not. This case-by-case approach preserves the sentencing judge's flexibility to consider the relevant circumstances and craft an appropriately tailored condition.

Here, after considering all of the evidence, the district court concluded the polygraph condition was necessary. The court found that Warren's "past criminal conduct … acting as a moderator for a private website group that actively solicited, organized and posted new, disturbing images and videos of child abuse … is more than sufficient to defer to the Probation Office's recommendation that the defendant be subject to polygraph testing … at least for an initial period of his supervision." *Warren*, 2016 WL 738779, at *1. The court explained that the polygraph testing was appropriate whether it was used "to obtain a more complete sexual history, help the defendant to confront the full context of his crime of conviction or to monitor his ongoing compliance with treatment and supervised release conditions." *Id*. at *13. The court further noted that "there is more than enough in this record to suggest that defendant has yet to disclose the full scope of his past sexual misconduct, is in denial about the full scope of his criminal

conduct here and has given his Probation Officer pause about his ongoing conduct." *Id*. Indeed, Warren's denial of the seriousness of his criminal conduct is further underscored by his submissions on appeal that "there's no evidence that [he] ever had a specific interest in children" and that his conduct was "far removed" from children. Ultimately, the district court concluded that the polygraph condition—including its reliance on the probation officer's discretion—was reasonable. We agree. Accordingly, the district court did not abuse its discretion in imposing it.

Warren also argues that in conjunction with its intrusiveness, polygraph testing's inaccuracy and unreliability outweigh its usefulness in the context of supervised release. The district court pointed to the efficacy of polygraph tests at promoting public safety, noting that they often reveal additional, previously unknown behaviors that were either violations of conditions of release or other "high-risk" behavior. *Warren*, 2016 WL 738779, at *12. Regardless, as the district court observed, polygraph conditions have been upheld by every circuit where the circumstances warranted it. *See Warren*, 2016 WL 738779, at *11 n.8 (collecting cases). We see no reason to depart from that trend today.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.